IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | CHAPTER ELEVEN |
| | : | |
| LEHIGH COAL & NAVIGATION COMPANY | : | BANKRUPTCY NO.: 5-08-bk-51957 |
| | : | |
| DEBTOR | : | |
| | : | |
| COALDALE ENERGY L.P., | : | {**Nature of Proceeding**: Motion for Relief from Stay (Doc. #280)} |
| | : | |
| MOVANT | : | |
| | : | |
| vs. | : | |
| | : | |
| LEHIGH COAL & NAVIGATION COMPANY, | : | |
| | : | |
| RESPONDENT | : | |

# OPINION

Coaldale Energy L.P., through its general partner Coaldale Energy, LLC, (collectively Coaldale), has filed for relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(1) for cause to terminate certain contracts with the Debtor, Lehigh Coal & Navigation Company (Lehigh).

While a series of agreements have been entered into between the Coaldale and Lehigh entities, the agreement central to the issue appears to be a certain Purchase and Services Agreement wherein 1,716,000 tons of coal silt was transferred from Lehigh to Coaldale for approximately $13,000,000. The silt sits on property owned by Lehigh and is covered by what is know as "overburden" necessitating removal prior to transfer. Implicated are issues of access to what is known as the Great Lakes Silt Dam as well as disposal of the rather significant overburden material. While this capsulizes the facts, in

actuality, the Agreement is much more complex as is the relationship between the parties.

Lehigh is an entity solely owned by James J. Curran, Jr. It is possessed of 8000+ acres of land in Schuylkill County, Pennsylvania, holding vast coal reserves estimated to be worth values exceeding $100,000,000. Notwithstanding this rather significant asset, Lehigh found itself cash poor and in dire straits.

The Curran family members play a significant role in the development of the relationship between Lehigh and Coaldale. Testifying at trial was Caitlin Curran Hatch, daughter of James J. Curran Jr. and Lehigh's corporate counsel as well as a member of the board of directors. Also testifying were estranged children of James J. Curran, Jr., i.e. Sean Curran, former president of Lehigh, and James J. Curran, III, a/k/a Jamie, a foreman and vice-president of operations. Both Sean and Jamie are allied with Coaldale.

Sean Curran had a falling out with his father and left the operation of Lehigh only to be summoned when Lehigh fell on hard times. It seems that Sean had the contacts and ability to secure financing when Lehigh could not do so on its own. It was through Sean's efforts that the Coaldale entities emerged on the scene as a so-called white knight to assist Lehigh in funding its operations. That funding came at a price, however. On April 17, 2006, Lehigh and Coaldale entered into a Management Agreement by which Coaldale was authorized to manage the Lehigh operations. The Management Agreement was in effect until rejected by this Court on October 1, 2008, over Coaldale's objection. On July 25, 2006, the parties entered into a Purchase and Services Agreement for the sale of the above referenced silt. The Agreement included a 15% "parallel interest" in favor of Lehigh. Exhibit D-1, Article I at ¶ 1.3(a). The Agreement also included a Services provision wherein Lehigh would remove overburden and process coal silt to provide a

finished product. Lehigh was also appointed as a selling agent for Coaldale.

The Agreement gave to Coaldale the right to terminate the Agreement, "in its sole discretion." *Id*. at Article VIII at ¶ 8.1.

A review of the Purchase and Services Agreement, together with the contemporaneously executed Bill of Sale (Exhibit C-2 at part 2), Indenture (Exhibit C-4), and Easement Agreement (Exhibit C-2 at part 5), leads to the inescapable conclusion that the conveyance of the silt removed a significant portion of that asset from Lehigh inventory, and thus, a substantial portion of that silt is no longer property of the estate as that term is defined in 11 U.S.C. § 541. For the most part, the Movant is not seeking to obtain control over property of the estate, but rather, Movant is seeking to obtain possession of property *from the estate* under 11 U.S.C. § 362(a)(3).

The Movant, Coaldale, however, is seeking more than just the possession of the silt. In its Motion, it seeks an order:

    a.    Permitting Coaldale to terminate the Purchase and Services Agreement dated as of July 26, 2006;

    b.    Permitting Coaldale to terminate its Lease and repossess its Equipment;

    c.    Permitting Coaldale to exercise its rights under the Indenture dated July 25, 2006 and Easement Agreement dated July 25, 2006;

    d.    Finding that issuance of a mining permit to Coaldale is not stayed, or to the extent it is stayed, granting relief for the permit to issue;

    e.    Enjoining Lehigh, its officers, directors, employees, and agents from interfering with Coaldale's efforts to obtain its own regulatory

>   approvals and permits to enable Coaldale to conduct independent mining and reclamation operations associated with recovering its Great Lakes Silt; and
>
> f.   Granting such other and further relief as is just and equitable.

Motion for Relief, Doc. No. 280 at pp. 25-26.

While Coaldale seeks relief "to terminate the Purchase and Services Agreement," the Court is unclear as to the impact of such termination. I note, first, that Coaldale has specifically retained the right to terminate the exclusive agency of Lehigh as a sales agent for the purchased silt in ¶ 3.3 of the Agreement. Nevertheless, Coaldale has, more generally, retained the right to terminate the entire Agreement in ¶ 8.1. This leaves open the question of whether a termination would effect a rescission of the sale. Certainly, an argument can be made that the sale is not finalized since the silt remains in the possession of Lehigh, and Coaldale still retains a portion of the consideration in its separate bank account identified as the "Reclamation Reserve Fund." A party with a right to terminate cannot usually pick and choose what provisions it would care to terminate,CJS CONTRACTS § 447 ("In the absence of an express provision therefor, a contract cannot be partially abrogated under a provision for its termination.")

This matter was heard over several days and many witnesses. What appears undisputed is the fact that dissecting the multi–faceted Purchase and Services Agreement is essential to properly dispose of the Motion before me. Clearly, Article I reflects an agreement to convey 1,716,000 tons of Great Lake Silt. In ¶ 1.3, Lehigh retains a 15% interest in the proceeds of every sale, referred to as a "parallel interest." In addition, Lehigh retained a repurchase option allowing Lehigh to buy back the remaining silt after

K:\Cathy\Opinions-Orders filed 2009\5-08-bk-51957_Lehigh_Coal.pdf      4

Case 5:08-bk-51957-JJT   Doc 558   Filed 06/12/09   Entered 06/12/09 16:39:42   Desc
Main Document      Page 4 of 8

Coaldale generates a certain "recovery." ¶ 1.3(b). In Article III of the Agreement, Lehigh agreed to remove the overburden. Lehigh further agreed to screen the silt and, at a mutually agreeable price, to process this screened material. In Article III, ¶ 3.3, Coaldale appointed Lehigh as its exclusive sales agent.

Section 362(d)(1) authorizes the Court to lift the automatic stay for cause. The code provides no definition of "cause." It appears that cause is derived from the balancing of various factors viewed in the light of arriving at an equitable result. Its exact parameters are left to the "totality of the circumstances in each particular case." *In re Wilson (Baldino v. Wilson)*, 116 F.3d 87, 90 (3d Cir.1997).

After multi-day hearings, the following facts can be found.

The property in question (the Great Lakes Silt Dam) was purchased by Coaldale in 2006, which, per contract, "owns," at least, an 85% interest in same with 15% equity retained by Lehigh.

Through various instruments, Coaldale has obtained access to the Silt Dam.

While Lehigh's interest in working the Silt Dam is of considerable value, it occupies a mere fraction of the Lehigh acreage and mineral rights and is, thus, not essential to an effective organization.

The relationship between Lehigh and Coaldale is so strained that the ability to work together on a common venture is burdened by the rather significant animosities that exist between the parties. The Purchase and Services Agreement is a major point of contention between the parties.

The Debtor, Lehigh, has been in Chapter 11 for 11 months without filing a plan while admittedly engaged in an extraordinary amount of litigation.

Multi-party use of right of ways and easements in or around the Silt Dam would involve significant logistical issues.

The validity of the transaction has been called into question by Lehigh and litigation has begun (5:08-ap-50218-JJT). The Court has not been given any reason to believe that a money judgment against Coaldale would be uncollectible should Lehigh be successful.

In a Motion for Relief from the Automatic Stay based on § 362(d)(1) "cause," the issue of adequate protection is critical. *Nazareth Nat'l Bank v. Trina-Dee, Inc*., 731 F.2d 170 (3d Cir.1984). To some degree, Lehigh is implying that its litigation against Coaldale and others is sufficient adequate protection to forestall Coaldale's claim that they should have immediate rights to terminate the Purchase and Services Agreement. Our Court of Appeals, in an unpublished opinion, concluded that the speculative nature of a lawsuit was insufficient to represent adequate protection. *In re Rocco*, 255 Fed. Appx. 638, 641 (3d Cir.2007). *Rocco* dealt with a movant that was the owner of the property in question by virtue of a completed foreclosure sale such that right to possession was vested in the movant. Similarly, in the case before me , Coaldale has an apparent ownership interest of, at least, 85% of the Silt Dam.

Coaldale has argued that pivotal to the disposition of this case is the ability of Coaldale to terminate the Purchase and Services Agreement, at will. This fact, however, may not be sufficient to constitute cause to grant relief. *Elder-Beerman Stores Corp*., 195 B.R. 1012, 1017 (Bkrtcy. S.D.Ohio 1996). In fact, cancelling the contract may lead to the inference that the movant is acting in bad faith. *In re National Hydro-Vac Industrial Services, L.L.C.,* 262 B.R. 781, 787 (Bkrtcy. E.D.Ark. 2001). This may be

especially true in jurisdictions, like Pennsylvania, that imply a duty of good faith. *Cox v. CSX Intermodal, Inc.*, 732 So.2d 1092, 1097 (Fla.App. 1 Dist. 1999). See, for example, *Creeger Brick & Building Supply v. Mid-State Bank & Trust Co.*, 385 Pa.Super. 30, 560 A.2d 151, 153 (1989).

    I am convinced that the possibilities of long term success of the Debtor-in-Possession can only be increased by a termination of the animus between the parties. I can speculate that the rejection of the agreements between the parties may, in fact, be of benefit to Lehigh for that reason. Having said that, acceptance or rejection of the Agreement is not before me at this time. The sole issue before me is whether Coaldale has cause to have the automatic stay terminated. The burden of proof, by statute, is on the Debtor, Lehigh. 11 U.S.C. § 362(g)(2). Lehigh has shown an equitable interest in the Silt Dam of 15%. There is no evidence that the Dam is losing value apart from the normal fluctuations in the market. If the asset is not losing value, then the need for adequate protection is reduced. In fact, the very Agreement in question made clear that the Coaldale investors anticipated a 300% return on their investment ¶ 1.3(e). This is supportive of a conclusion that the Silt Dam is valued at significantly more than the Coaldale obligation allowing me to conclude that the Coaldale investment is relatively secure for the time being. To the extent that the Great Lakes Silt is utilized by Lehigh, it is subject to the terms of the Agreement. Nevertheless, Lehigh cannot indefinitely use the automatic stay to wrestle control of the Silt Dam from Coaldale. The automatic stay is a shield, not a weapon. *United Savings Ass'n v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 626, 98 L.Ed.2d 740 (1988) makes clear that the automatic stay should be allowed to exist until the debtor is able to reorganize *within a reasonable time*. *Id.* 484

U.S. at 376, 380 and 108 S.Ct. at 633, 635. While the initial difficulty in presenting a Chapter 11 plan was likely the uncertainty of whether Lehigh's Management Agreement with Coaldale could be rejected, any further delays should not be used to prevent Coaldale from extracting its property from the possession of Lehigh. I find that a delay in effecting a reorganization to be of sufficient cause as to lift the automatic stay.

The code makes clear that this Court is empowered to not only terminate the stay, but to also condition or modify it. 11 U.S.C. § 362(d). I note that Lehigh has been granted exclusivity regarding the filing of a Chapter 11 plan until July 27, 2009. Doc. No. 471. I will continue the automatic stay as it exists until 90 days after that date, i.e., Sunday, October 25, 2009. Nevertheless, the record makes clear that Coaldale's exercise of the options available under the Purchase and Services Agreement could be so disruptive as to destroy any meaningful reorganization efforts of the Debtor, Lehigh. Therefore, the stay will be lifted only to the extent necessary to allow the reasonable extraction of silt from the Great Lake Silt Dam pursuant to a precisely detailed plan to be filed by Coaldale within 30 days and approved by the Court. The extraction plan shall allow for a minimum of disruption to Lehigh's operations.

My Order is attached.

Date: June 12, 2009

John J. Thomas, Bankruptcy Judge
(CMS)

*This opinion is electronically signed and filed on the same date.*