# UNITED STATES BANKRUPTCY COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| **Lehigh Coal and Navigation Company,** | : | Case No. 08-51957-JJT |
| | : | |
| Debtor. | : | |

## EMERGENCY MOTION OF DEBTOR LEHIGH COAL AND NAVIGATION COMPANY FOR ENTRY OF INTERIM ORDER (A) AUTHORIZING THE DEBTOR TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 364(c) and 364(d); (B) GRANTING PRIMING LIENS AND SUPERPRIORITY CLAIMS; (C) GRANTING ADEQUATE PROTECTION TO PRE-PETITION SENIOR LENDERS; AND (D) SCHEDULING A FURTHER HEARING

Lehigh Coal and Navigation Company (the "Debtor") hereby moves this Court for an Order (a) authorizing the Debtor to obtain post-petition financing pursuant to 11 U.S.C. §§ 364(c)(1) and 364(d); (b) granting priming liens and superpriority claims to the proposed DIP Lenders (as defined below); (c) granting adequate protection to the Pre-Petition Senior Lenders (as defined below); and (d) scheduling further hearing. In support of the Motion, the Debtor avers as follows:

## I.    BACKGROUND

1.    An involuntary petition for relief under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code") was filed against the Debtor on July 15, 2008 by Bruce Toll, Douglas Topkis, Primerock Capital LLC, and The Bruce and Robbi Toll Foundation (the "Petitioning Creditors").

2.    The Debtor consented to the entry of an order for relief, which was entered on August 28, 2008.

3.    Upon information and belief, a security interest in and/or liens on the Debtor's assets, is asserted by (1) the United States Department of Agriculture ("USDA"); (2) a group of

approximately 43 investors in a loan transaction with the Debtor of up to $4,000,000 having an initial closing date of February 20, 2007 (the "Investors"); (3) the Anthracite Health and Welfare Fund ("AHWF"); and (4) The Bruce and Robbi Toll Foundation (the "Toll Foundation"). The USDA, the Investors, AHWF, and the Toll Foundation are sometimes collectively referred to herein as the "Pre-Petition Senior Lenders."

4. The USDA's asserted security interest arises from a loan transaction dated on or about February 28, 2002 in the original principal amount of approximately $9,000,000. In connection with such loan transaction, the Debtor granted the USDA a security interest in, inter alia, accounts and other cash collateral. The USDA subsequently entered into a forbearance agreement on or about July 25, 2006 by which it agreed to a partial termination of its security interest relating to approximately 1.7 million tons of coal silt deposits located in an area known as the Great Lakes Dam, and the proceeds from the sale of such material to Coaldale Energy LP.

5. The Investors, including the Petitioning Creditors, assert a security interest in the Debtor's assets pursuant to a Security Agreement dated February 20, 2007.

6. AHWF asserts a security interest in the Debtor's assets relating to payments to the Debtor by Ash Resources, Inc., Panther Creek Partners, and certain specific contracts known as the Nardini Lease and the Ash Disposal Agreement.

7. The Toll Foundation asserts a security interest in the Debtor's assets in connection with a Purchase and Service Agreement and related documentation dated July 11, 2007.

8. In March 2009, the market for anthracite coal suffered a sharp and unexpected downturn, which resulted in a sudden decline in the Debtor's revenues. This market change, combined with the overall state of the economy, which was has resulted in slow payment of the Debtor's receivables, has left the Debtor with a serious cash shortfall in recent months.

## II. RELIEF REQUESTED

9. Currently, the Debtor is in danger of being unable to meet certain obligations, including payroll and other expenses, that are crucial to the ongoing operations of the Debtor's business. The Debtor, accordingly, is in need of immediate financing to allow it to fund essential operating expenses over the next several months.

10. The Debtor has negotiated a comprehensive DIP financing facility (the "DIP Financing Transaction") with BET Associates IV LLC (the "DIP Lender"), which would provide a line of credit to the Debtor of approximately $3.5 million to allow the Debtor to meet its operational and administrative expenses in upcoming months. The DIP Lender is owned by the same parties who comprise the Petitioning Creditors, with the exception of Douglas Topkis, who is not participating in the DIP Financing Transaction. Bruce Toll, Primerock Capital LLC and the Bruce and Robbi Toll Foundation are collectively referred to as the "Participating Petitioning Creditors."

11. Pursuant to Section 364(c) and (d), the Debtor respectfully requests that this Court enter an Order approving the DIP Financing Transaction on an emergency, interim basis. This financing is necessary for the Debtor to continue operations until it can seek final Court approval.

12. The proposed financing will be senior to all obligations held by the Pre-Petition Senior Lenders. As such, the liens created under the proposed DIP Financing Transaction are priming liens with respect to liens currently held by the Pre-Petition Senior Lenders.

13. The priming liens proposed by the DIP Financing Transaction would have the effect of priming all other liens on the Debtor's assets to the extent of approximately $15 million, which is the aggregate amount of the pre-petition indebtedness of the Participating Petitioning Creditors plus the $3.5 million of new financing. The Participating Petitioning Creditors

(through the DIP Lender) will not lend further funds to the Debtor unless their prior debt is given greater security through an increased priority position.

    A.    **Background of Proposed DIP Financing Transaction**

14. The Debtor is in the process of finalizing an agreement with the DIP Lender (the "DIP Financing Agreement"). The Debtor and the DIP Lender expect that the executed DIP Financing Agreement will be substantially in the form attached hereto as Exhibit A. Certain details of the DIP Financing Agreement, including certain Schedules and Exhibits thereto, are still being finalized and the attached agreement is subject to change. A final executed version of the DIP Financing Agreement will be filed once it is available.

15. In connection with the DIP Financing Transaction, the Debtor's sole shareholder James J. Curran, Jr. executed a Limited Non-Recourse Guaranty and Suretyship Agreement and a Collateral Pledge Agreement, which pledges Mr. Curran's stock in the Debtor.

16. In accordance with Federal Bankruptcy Rule 4001(c)(2), the material provisions of the proposed DIP Financing Transaction, as they exist today, are as follows:

    a.    *Borrower*: Debtor Lehigh Coal and Navigation Company. See Exhibit A at 1.

    b.    *Non-Recourse Guarantor*: James J. Curran, Jr. See Exhibit § 3.1(f).

    c.    *Use of Funds*: Funds from the DIP Financing Transaction shall be used (a) to fund working capital requirements of the Debtor, operating expenses of the Debtor, capital expenditures and other line items in accordance with a proposed budget, in the ordinary course of the Debtor's business, as well as certain administrative expenses of the Debtor's bankruptcy case; (b) to pay required payments to the USDA; (c) to make payments required to the Pennsylvania Department of Environmental Protection; (d) to satisfy in full the Debtor's obligations under certain Pre-Sale Agreements with the Participating Petitioning Creditors, as well as pay certain obligations to the Participating Petitioning Creditors under certain Bridge Notes, in a stipulated amount; (e) to pay interest accrued on the DIP Financing Transaction; and (f) to pay certain fees and expenses of the DIP Lenders relating to the DIP Financing Transaction. See Exhibit A § 2.5; Interim DIP Order ¶ 6.

d. *Security*: First and priming liens on all assets of the Debtor, including a pledge of the equity in the Debtor, as well as a superiority claim in the Debtor's bankruptcy case, although the liens are to be subordinate to certain professional fees and carve outs, as described more fully in the Term Sheet. See Exhibit A § 11.1(a); Interim DIP Order ¶¶ 10, 11.

e. *DIP Facility Amount*: $3.5 million, plus the stipulated amount necessary to pay the Participating Petitioning Creditors' claims under certain Pre-Sale Agreements and Bridge Notes. See Exhibit A ¶ 2.1(a) and (b); Interim DIP Order ¶ 2.

f. *Interest*: 11 percent per annum. Default interest of an additional 2% per annum. See Exhibit A § 2.2; Interim DIP Order 8.

g. *Fees*: $60,000 up front fee; $30,000 administrative fee; fees for audits and appraisals and other expenses of the DIP Lender. See Exhibit A §§ 2.3, 9.2; Interim DIP Order ¶ 9.

h. *Maturity*: Outside maturity date of December 31, 2009. See Exhibit A at 14 ("Termination Date"); Interim DIP Order ¶ 21.

j. *Events of Default*: Events of default include (1) failure to make payments when due; (2) breach of certain covenants; (3) breach of warranty; (4) default of performance obligations under DIP Financing Agreement; (5) dissolution of Debtor; (6) invalidity of guaranty, failure of security or repudiation of obligations; (7) certain material events in the Debtor bankruptcy case, including dismissal or conversion, say of final DIP Financing Order, failure to file a plan of reorganization or disclosure statement to which DIP Lender does consents, challenge to certain claims of the DIP Lender and Participating Petitioning Creditors, seeking a substitution of collateral, unpermitted payment under the Budget, certain orders granting relief from the automatic stay, the occurrence of a Material Adverse Effect, as defined in the DIP Financing Agreement, or the Debtor filing any Motion challenging the liens and claims granted by the DIP Financing Agreement; (8) material change in management of the Debtor; and (9) certain labor disputes. See Exhibit A §§ 7.1 through 7.9.

## Disclosure of Certain Provisions of Term Sheet

17. Pursuant to Federal Rule of Bankruptcy Procedure 4001(c)(1)(B) and Local Bankruptcy Rule 4001-3(c), the Debtor hereby discloses that of those provisions set forth in the Federal and Local Rule, the following provisions are currently contained in the DIP Financing Agreement and/or Proposed Interim DIP Order:

a. Federal Rule of Bankruptcy Procedure 4001(c)(1)(B)(i) and (ii) and Local Rule 4001-3(c)(3)(A) and (E): As set forth in Section 2.5 of the DIP Financing

Agreement, the proceeds of the proposed DIP Financing Transaction would be used to satisfy, in a stipulated amount, the Participating Petitioning Creditors' claims under certain Pre-Sale Agreements and Bridge Notes. Thus, the DIP Financing Transaction effectively proposes to use post-petition loans from pre-petition secured creditors to pay part or all of that secured creditor's pre-petition debt, including certain claims under the Pre-Sale Agreements that are currently unsecured.

This provision is necessary for the DIP Lender to agree to enter into the DIP Financing Transaction. The Participating Petitioning Creditors (through the DIP Lender) will not lend further funds to the Debtor unless their prior debt is given greater security through an increased priority position.

b. <u>Federal Rule of Bankruptcy Procedure 4001(c)(1)(B)(iv)</u>: As set forth in the proposed Interim DIP Financing Order, the Debtor and the DIP Lender propose that the automatic stay provisions of Section 362 of the Bankruptcy Code are vacated and modified to permit the DIP Lender (1) to file any financing statement or other appropriate documents; (2) upon the occurrence of an Event of Default and upon five business days' written notice to exercise all rights and remedies provided for in the DIP Financing Agreement. <u>See</u> Interim DIP Order ¶ 23.

c. <u>Federal Rule of Bankruptcy Procedure 4001(c)(1)(B)(ix)</u>: As set forth in Section 9.3 of the DIP Financing Agreement, the Debtor proposes to indemnify the DIP Lender, each Participating Petitioning Creditor, and their respective affiliates, officers, directors, agents, employees, attorneys and advisors against any and all claims relating to the DIP Financing Transaction. <u>See</u> Exhibit A § 9.3.

d. <u>Local Rule 4001-3(c)(3)(G)</u>: As set forth in Section 11.1 of the DIP Financing Agreement, the Debtor proposes to provide priming liens to the DIP Lender, which would prime all existing secured creditors, including the USDA, AHWF, and the Bridge Notes not held by the Participating Petitioning Creditors without their respective consent.

The DIP Lender is not willing to enter into the DIP Financing Transaction unless it is provided with first and priming liens on all of the Debtor's assets. Given the lack of other alternatives for financing, the Debtor believes that it is necessary to grant such priming liens to ensure the survival of the Debtor's business operations. As discussed in greater detail below, the Pre-Petition Secured Lenders are adequately protected by the current value of the Debtor's assets, including substantial and valuable coal reserves.

e. <u>Local Rule 4001-3(C)(3)(H)</u>: As set forth in Section 2.6 of the DIP Financing Agreement, the Debtor proposes to release the DIP Lender, the Participating Petitioning Creditors and their respective affiliates, officers, directors, agents, employees, attorneys and advisors against any and all claims arising as of the date the DIP Financing Agreement is executed.

This provision is necessary for the DIP Lender to agree to enter into the DIP Financing Transaction. The Participating Petitioning Creditors (through the DIP Lender) will not lend further funds to the Debtor unless they obtain a broad release of any claims.

f. <u>Federal Rule of Bankruptcy Procedure 4001(c)(1)(B)(xi) and Local Rule 4001-3(c)(3)(D)</u>: the DIP Financing Agreement provides that the DIP Lender's lien will attach to all assets of the Debtor, which includes the Debtor's claims and causes of action arising under 11 U.S.C. §§ 544, 545, 547, 548, and 549.

A blanket lien on all of the Debtor's assets was necessary for the DIP Lender to agree to the DIP Financing Transaction. Without the DIP Financing Transaction, the Debtor would not have sufficient funds available to pursue any avoidance actions.

18. In accordance with Local Bankruptcy Rule 4001-3(e), attached hereto as Exhibit B is a proposed budget (the "Budget") through December 31, 2009.

**B.     It Is Appropriate to Provide the DIP Lender with a Superpriority Claim**

Pursuant to Section 364(c):

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

11 U.S.C. § 364(c). Thus, the extent the Debtor cannot obtain unsecured credit or unsecured debtor, the Court may allow the Debtor to provide a superpriority claim to the DIP Lender.

19. Given the current state of the coal market, and the fact that the Debtor is currently in bankruptcy, the Debtor is not in a position to obtain unsecured credit or unsecured debt to pay its necessary operating expenses. Such funding can only be obtained if the Court approves the DIP Lender's superpriority claim.

20. It is necessary that the Debtor be authorized on an emergency, interim basis to enter into the DIP Financing Agreement, so that the Debtor can meet its payroll and other operational expenses and stabilize its business. Stabilization and ongoing operation of the Debtor's business is beneficial to all creditors and parties-in-interest in this bankruptcy case.

### C. It Is Appropriate to Provide the DIP Lender with a First and Priming Lien on All Assets to the Extent of Existing Indebtedness and New Financing.

21. In accordance with Section 364(d)(1):

> The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—
>
> > (A) the trustee is unable to obtain such credit otherwise;
> >
> > (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

22. As noted above, the priming liens proposed by the DIP Financing Transaction would prime all other liens on the Debtor's assets to the extent of approximately $15.3 million. This amount is the aggregate of (a) the $3.5 million line of credit provided for in the DIP Financing Agreement; (b) the claims of the Participating Petitioning Creditors relating to the Bridge Notes, which total approximately $8.5 million; and (c) the secured and unsecured claims of the Participating Petitioning Creditors relating to the Pre-Sale Agreement, which total approximately $3.3 million.

23. Given the current state of the anthracite coal market, and the current state of credit markets in general, the Debtor has been unable to obtain any alternative financing. Moreover,

the DIP Lender is only prepared to consummate the proposed DIP Financing Transaction if it is granted first and priming liens on all of the Debtor's assets.

24. Such priming liens should be granted, as the USDA, AHWF and holders of the Bridge Notes are all adequately protected by the significant equity cushion in the Debtor's Assets.

25. Whether or not a secured creditor is adequately protected is decided on a case-by-case basis. E.g., In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986); In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); see also In re JKJ Chevrolet, Inc., 190 B.R. 542, 545 (Bankr. E.D. Va. 1995) (adequate protection is a flexible concept that is determined by considering the facts of each case).

26. While "adequate protection" is not defined in the Bankruptcy Code, Section 361 provides certain non-exclusive examples of how adequate protection may be provided by a Debtor:

> (1) requiring the [debtor] to make a cash payment or periodic cash payments to such entity, to the extent that the . . . use . . . under section 363 . . . results in a decrease in the value of such entity's interest in such property;
>
> (2) providing to such entity an additional or replacement lien to the extent that such . . . use . . . results in a decrease in the value of such entity's interest in such property; or
>
> (3) granting such other relief . . . as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361.

27. Essentially, the concept of adequate protection is intended to protect a secured creditor from the diminution in the value of its interest in certain collateral during the period of use (for example, as collateral for post-petition financing). In re Hubbard Power & Light, 202

808248_3                                          9

Case 5:08-bk-51957-JJT    Doc 639    Filed 07/21/09    Entered 07/21/09 17:59:51    Desc
                         Main Document         Page 9 of 11

B.R. 680, 685 (Bankr. S.D.N.Y. 1996); In re Nice, 355 B.R. 554, 563 (Bankr. N.D. Va. 2006) ("[A]dequate protection is solely a function of preserving the value of the creditor's secured claim as of the petition date due to a debtor's continued use of collateral.").

28. The Debtor believes that the Pre-Petition Senior Lenders are adequately protected by the significant equity cushion in the Debtor's assets, as well as the continuation of the Debtor's business operations.

29. The proposed DIP Financing Transaction would permit the Debtor to continue to operate its business and would provide some stability going forward. The continued operation of the Debtor's business would preserve the value of the collateral, as the Debtor's assets are collectively more valuable if the Debtor continues to operate as a going concern. Because the going concern value exceeds liquidation value, the Pre-Petition Senior Lenders are adequately protected.

30. More importantly, however, the Pre-Petition Senior Lenders are adequately protected by the significant equity cushion in the Debtor's assets. Currently, the Debtor owns hundreds of millions of tons of anthracite coal reserves. These reserves are very valuable.

31. Based on evidence previously presented to this Court, it is estimated that the coal reserves alone are worth substantially more than the aggregate claims of the Pre-Petition Secured Lenders, which total less than $25 million. Because of this significant equity cushion, the Pre-Petition Secured Lenders are adequately protected by the proposed DIP Financing Transaction.

WHEREFORE, the Debtor respectfully requests that this Court enter an order pursuant to 11 U.S.C. §§ 364(c)(1) and 364(d) (i) authorizing the Debtor to obtain post-petition financing pursuant to 11 U.S.C. §§ 364(c)(1) and 364(d); (ii) authorizing the Debtor to execute the DIP Financing Agreement on an interim, emergency basis; (iii) granting liens and superpriority

claims to the proposed DIP Lender; (iv) granting adequate protection to the Pre-Petition Senior Lenders; and (v) scheduling a further hearing to consider approval of financing on a final basis.

Date: July 21, 2009                    Respectfully submitted,

/s/ Jennifer L. Maleski
Lawrence G. McMichael (PA No. 28550)
Peter C. Hughes (PA No. 62806)
Jennifer L. Maleski (PA No. 93154)
Dilworth Paxson LLP
1500 Market Street, Suite 3500E
Philadelphia, PA 19102
Tel: (215) 575-7000

Attorneys for Debtor

808248_3                                    11

Case 5:08-bk-51957-JJT    Doc 639    Filed 07/21/09    Entered 07/21/09 17:59:51    Desc
                    Main Document         Page 11 of 11