# EXHIBIT A

# DEBTOR-IN-POSSESSION
# CREDIT AND SECURITY AGREEMENT

among

## LEHIGH COAL AND NAVIGATION COMPANY,
*a Chapter 11 Debtor and Debtor-in-Possession*
*as Debtor,*

and

## BET ASSOCIATES IV, LLC,
*as Administrative Agent,*

and

## THE LENDERS NAMED HEREIN,
*as Lenders.*

**July __, 2009**

# TABLE OF CONTENTS

Page

SECTION 1.  DEFINITIONS.................................................................................................2
  1.1 Certain Defined Terms............................................................................................2

  1.2 Accounting Terms.................................................................................................15

  1.3 Rules of Construction ...........................................................................................15

SECTION 2.  AMOUNTS AND TERMS OF COMMITMENTS AND LOANS......................15
  2.1 Loans......................................................................................................................15

  2.2 Interest on the Loans............................................................................................18

  2.3 Fees.......................................................................................................................18

  2.4 Repayments of Loans...........................................................................................18

  2.5 Use of Proceeds...................................................................................................20

  2.6 Release .................................................................................................................20

  2.7 Increased Costs; Taxes; Capital Adequacy........................................................21

SECTION 3.  CONDITIONS TO LOANS.............................................................................24
  3.1 Effectiveness........................................................................................................24

  3.2 All Borrowings......................................................................................................25

  3.3 Interim Borrowing ................................................................................................26

SECTION 4.  REPRESENTATIONS AND WARRANTIES..................................................26
  4.1 Organization and Good Standing.........................................................................26

  4.2 Authorization and Power ......................................................................................27

  4.3 No Conflicts or Consents .....................................................................................27

  4.4 Enforceable Obligations.......................................................................................27

  4.5 No Liens................................................................................................................27

  4.6 Interim and Final Orders ......................................................................................27

  4.7 No Default.............................................................................................................27

Lehigh Coal - BET Associates DIP Credit Agreement - DP Draft 7-17-09 (2) (2)

4.8  Use of Proceeds; Margin Stock..................................................................27

4.9  Principal Office, Etc...............................................................................28

4.10  Compliance with Law ...........................................................................28

4.11  Subsidiaries .........................................................................................28

4.12  Collateral Documents; Description and Location of Assets ............................28

4.13  ERISA .................................................................................................28

4.14  Labor Matters.......................................................................................28

4.15  Licenses, Permits, etc............................................................................28

4.16  Representations and Warranties ..............................................................28

SECTION 5.  AFFIRMATIVE COVENANTS................................................................28
5.1  Financial Statements and Other Reports....................................................29

5.2  Budget. ...............................................................................................29

5.3  Corporate Existence ..............................................................................30

5.4  Maintenance of Properties; Insurance.......................................................30

5.5  Inspection ...........................................................................................31

5.6  Compliance with Laws, etc......................................................................31

5.7  Environmental Disclosure and Inspection ..................................................31

5.8  Debtor's Remedial Action Regarding Hazardous Materials .............................31

5.9  Payment of Obligations..........................................................................31

5.10  Further Assurances...............................................................................32

5.11  Use of Proceeds...................................................................................32

5.12  Bankruptcy Information .........................................................................32

SECTION 6.  NEGATIVE COVENANTS ....................................................................32
6.1  Indebtedness........................................................................................32

6.2  Liens and Related Matters ......................................................................32

6.3  Fundamental Changes............................................................................33

(ii)

6.4   Disposition of Assets ................................................................................................33

6.5   Restricted Payments....................................................................................................33

6.6   Transactions with Affiliates........................................................................................33

6.7   Changes in Fiscal Periods ...........................................................................................33

6.8   Negative Pledge Clauses.............................................................................................33

6.9   Lines of Business .......................................................................................................33

6.10  Material Contracts.....................................................................................................34

6.11  Chapter 11 Claims.....................................................................................................34

6.12  Pre-Petition Payments...............................................................................................34

SECTION 7.  EVENTS OF DEFAULT ....................................................................................34
7.1   Failure to Make Payments When Due. .......................................................................34

7.2   Breach of Certain Covenants .....................................................................................34

7.3   Breach of Warranty....................................................................................................34

7.4   Other Defaults Under Loan Documents .....................................................................35

7.5   Dissolution ................................................................................................................35

7.6   Invalidity of Guaranty; Failure of Security; Repudiation of Obligations .....................35

7.7   Bankruptcy Matters....................................................................................................35

7.8   Change of Management ..............................................................................................36

7.9   Labor Dispute............................................................................................................37

SECTION 8.  ADMINISTRATIVE AGENT ............................................................................37
8.1   Appointment. ............................................................................................................37

8.2   Expenses ...................................................................................................................39

8.3   Proportionate Absorption of Losses............................................................................39

8.4   Delegation of Duties; Reliance ..................................................................................39

8.5   Limitation of Liability................................................................................................39

8.6   Default; Collateral.....................................................................................................41

8.7  Limitation of Liability ............................................................................................42

8.8  Relationship of Lenders ........................................................................................42

8.9  Benefits of Agreement ..........................................................................................42

8.10  Obligations Several ............................................................................................43

SECTION 9.  MISCELLANEOUS ........................................................................................43

9.1  Assignments and Participations. ...........................................................................43

9.2  Expenses .................................................................................................................45

9.3  Indemnity ...............................................................................................................45

9.4  Set-Off ....................................................................................................................46

9.5  Ratable Sharing ......................................................................................................46

9.6  Amendments and Waivers .....................................................................................47

9.7  Independence of Covenants ...................................................................................47

9.8  Notices ...................................................................................................................47

9.9  Survival of Representations, Warranties and Agreements. .................................47

9.10  Failure or Indulgence Not Waiver; Remedies Cumulative ...............................48

9.11  Marshalling; Payments Set Aside ....................................................................48

9.12  Severability .......................................................................................................48

9.13  Obligations Several; Independent Nature of Lenders' Rights...........................48

9.14  Headings ............................................................................................................49

9.15  Applicable Law .................................................................................................49

9.16  Successors and Assigns.....................................................................................49

9.17  Consent to Jurisdiction and Service of Process ...............................................49

9.18  Waiver of Jury Trial ..........................................................................................50

9.19  Confidentiality ..................................................................................................50

9.20  Maximum Amount. ...........................................................................................50

9.21  Counterparts; Effectiveness ..................................................................................51

9.22  Confession of Judgment.....................................................................................51

SECTION 10.  [RESERVED] .....................................................................................53
SECTION 11.  GRANT OF SECURITY, PRIORITIES AND LIENS; SURVIVAL OF CLAIMS53
11.1  Grant of Security..............................................................................................53

11.2  Covenants Relating to Collateral .....................................................................55

11.3  Remedial and Other Provisions. .....................................................................58

11.4  Priority and Liens.............................................................................................61

11.5  No Discharge; Survival of Claims ...................................................................61

**EXHIBITS**

A        FORM OF NOTICE OF BORROWING
B        FORM OF ASSIGNMENT AGREEMENT
2.8      TREATMENT OF LENDERS' CLAIMS

Lehigh Coal - BET Associates DIP Credit Agreement - DP Draft 7-17-09 (2) (2)

SCHEDULES

| | |
|---|---|
| 1. | PROMISSORY NOTES AND/OR PROCESSING FEE AGREEMENTS |
| 2. | PRE-PETITION OBLIGATION IN FAVOR OF THE BRUCE AND ROBBI TOLL FOUNDATION |
| 3. | PRE-PETITION OBLIGATIONS HELD BY ONE OR MORE LENDERS ARISING FROM CERTAIN PURCHASE AND SERVICE AGREEMENTS BETWEEN DEBTOR AND SUCH LENDERS |
| [4. | CREDITORS] |
| 4.13 | ERISA |
| 4.14 | LABOR MATTERS |
| 4.15 | LICENSES AND PERMITS |
| 2.1 | LENDERS' COMMITMENTS AND PRO RATA SHARES |
| 6.1(b) | EXISTING INDEBTEDNESS |
| 6.6 | AFFILIATE TRANSACTIONS |
| 11.1(b) | LOCATION OF PRINCIPAL PLACES OF BUSINESS, INVENTORY AND EQUIPMENT, REGISTERED INTELLECTUAL PROPERTY, PLEDGED STOCK AND PLEDGED NOTES |
| 11.2(h) | ROLLING STOCK |

# DEBTOR-IN-POSSESSION
## CREDIT AND SECURITY AGREEMENT

THIS DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT is entered into as of July \_\_\_\_, 2009 by and among **LEHIGH COAL AND NAVIGATION COMPANY**, a Pennsylvania corporation ("**Debtor**"), the lenders which are parties hereto (individually a "**Lender**" and collectively "**Lenders**") and **BET ASSOCIATES IV, LLC**, a _____ limited liability company, a Lender and as administrative agent for Lenders (in such capacity, "**Administrative Agent**").

**WHEREAS**, on July 15, 2008 (the "**Filing Date**"), Lenders (among other petitioning creditors) filed an involuntary petition (the "**Case**") under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") against Debtor pursuant to Section 303 of the Bankruptcy Code with the United States Bankruptcy Court for the Middle District of Pennsylvania (the "**Bankruptcy Court**"); and

**WHEREAS**, Debtor consented to an order for relief pursuant to Chapter 11 of the Bankruptcy Code on August 26, 2008, and continues in possession of its assets and in the management of its business pursuant to Sections 1107 and 1108 of the Bankruptcy Code as a debtor-in-possession; and

**WHEREAS**, Debtor has advised Administrative Agent and Lenders that it desires to continue in the operation of its business as a debtor-in-possession, and has requested that Lenders make certain loans, advances and extensions of credit to or for its benefit during the pendency of the Case to meet Debtor's immediate and anticipated needs for funds for the payment of wages, the purchase of Inventory and Equipment and other current and immediate operating expenses of Debtor. To minimize the disruption of Debtor as a "going concern," under the terms and subject to the conditions set forth herein and in the instruments, agreements or documents referred to herein, and in consideration of certain payments to be made to Lenders pursuant to the financing arrangements described herein, Lenders hereby severally agree to make additional loans, advances and extensions of credit to or for the Debtor in accordance with the terms of the Budget (as defined herein).

**NOW, THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, and intending to be legally bound hereby, Debtor, Lenders and Administrative Agent agree as follows:

## SECTION 1.
## DEFINITIONS

1.1    **Certain Defined Terms**. The following terms used in this Agreement shall have the following meanings:

"**Accounts**" has the meaning given in the UCC from time to time.

Lehigh Coal - BET Associates DIP Credit Agreement - DP Draft 7-17-09 (2) (2)

"**Administrative Agent**" has the meaning assigned to that term in the introduction to this Agreement and includes any successor Administrative Agent appointed pursuant to Section 8.1(c).

"**Affiliate**", as applied to any Person, means any other Person directly or indirectly controlling, controlled by or under common control with that Person. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise.

"**Agreement**" means this Debtor-in-Possession Credit and Security Agreement, as it may be amended, supplemented or otherwise modified from time to time.

"**Asset Sale**" means the sale, transfer or other disposition by Debtor to any Person of (a) all or substantially all of the assets of Debtor, or (b) any other assets (other than sales of raw coal, prepared coal, silt and other coal refuse, both screened and unscreened, in the ordinary course of business), in either instance, the proceeds from which exceed $50,000 for any individual transaction or $600,000 for all transactions during the term of this Agreement.

"**Assignment Agreement**" means an Assignment Agreement in substantially the form of **Exhibit B** annexed hereto.

"**Bankruptcy Code**" has the meaning assigned in the recitals to this Agreement.

"**Bankruptcy Court**" has the meaning assigned in the recitals to this Agreement.

"**Bankruptcy Plan**" means a plan of reorganization or liquidation for the Debtor confirmed by final order of the Bankruptcy Court that provides for the payment in full of all of the Obligations and that is otherwise acceptable to Lenders (including with respect to the treatment of any outstanding Pre-Petition Obligations) in their sole and absolute discretion.

"**Bridge Note Claims**" mean those certain secured Pre-Petition Obligations held by one or more Lenders arising out of and/or evidenced by those certain promissory notes (the "**Bridge Notes**") and/or processing fee agreements identified on Schedule 1 attached hereto, incorporated herein by this reference and made a part hereof.

"**Budget**" means the cash budget of Debtor relative to the operations of the Debtor in the Case for the period from the date of this Agreement through December 31, 2009, as delivered to Administrative Agent and Lenders, in form and substance reasonably satisfactory to Required Lenders.

"**Business Day**" means for all purposes, any day other than Saturday, Sunday and any day on which commercial banking institutions are required or authorized by Law to be closed in Philadelphia, Pennsylvania.

Lehigh Coal - BET Associates DIP Credit Agreement - DP Draft 7-17-09 (2) (2)

"**Capital Expenditures**" means, for any period, the aggregate of all expenditures (including that portion attributable to any Capital Lease incurred during that period) made by Debtor during such period in respect of the purchase, construction or other acquisition of fixed or capital assets, determined in accordance with GAAP.

"**Capital Lease**" means any capital lease or sublease which, in accordance with GAAP, would be capitalized on a balance sheet of Debtor.

"**Carve-Outs**" means the following: (a) prior to the occurrence of an Event of Default or the Termination Date, the payment of allowed professional fees and expenses, by the professionals retained pursuant to Sections 327, 363, or 1103(a) of the Bankruptcy Code in the Case as authorized in (and as may be limited by) the Budget; (b) from and after the occurrence of an Event of Default or the Termination Date, the payment of subsequently incurred allowed professional fees and expenses by the professionals retained pursuant to Sections 327, 363, or 1103(a) of the Bankruptcy Code in the Case in an amount not to exceed (i) $150,000 with respect to the Examiner and his counsel in the aggregate; (ii) $150,000 with respect to Dilworth Paxson LLP; and (iii) $50,000 with respect to the Official Committee of Unsecured Creditors and its counsel in the aggregate, minus any retainers still being held and available for application to the outstanding professional fees and expenses; and (c) fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and to the Clerk of the Bankruptcy Court; provided, that (a) nothing herein shall be deemed as a waiver of the rights of Administrative Agent or any Lenders to object to any requests for allowance of any fees or expenses; and (b) the carve outs set forth herein shall be co-extensive with, and not in addition to, the carve outs set forth in any cash collateral orders entered in the case.

"**Case**" has the meaning assigned in the recitals to this Agreement.

"**Cash**" means money, currency or a credit balance in a Deposit Account.

"**Cash Collateral**" has the meaning set forth in Section 363(a) of the Bankruptcy Code.

"**Cash Equivalents**" means, as at any date of determination, the following: (a) marketable securities (i) issued or directly and unconditionally guaranteed as to interest and principal by the United States Government or (ii) issued by any agency of the United States the obligations of which are backed by the full faith and credit of the United States, in each case, maturing within one year after such date; (b) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof, in each case, maturing within one year after such date and having, at the time of the acquisition thereof, the highest rating obtainable from either S&P or Moody's; (c) commercial paper maturing no more than one year from the date of creation thereof and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-l from Moody's; (d) certificates of deposit or bankers' acceptances maturing within one year after such date and issued or accepted by any commercial bank organized under the Laws of the United States of America or any state thereof or the District of Columbia that (i) is at least "adequately capitalized" (as defined in the regulations of its primary federal banking regulator) and (ii) has

Lehigh Coal - BET Associates DIP Credit Agreement - DP Draft 7-17-09 (2) (2)

Tier 1 capital (as defined in such regulations) of not less than $100,000,000; and (e) shares of any money market mutual fund that (i) has at least ninety-five (95%) percent of its assets invested continuously in the types of investments referred to in <u>clauses (a)</u> and <u>(b)</u> above, (ii) has net assets of not less than $500,000,000, and (iii) has the highest rating obtainable from either S&P or Moody's.

"**Casualty Event**" means the damage or destruction by any casualty whatsoever of any property of Debtor, the insurance proceeds from which exceed $50,000 for any individual casualty event or $250,000 for all casualty events during the term of this Agreement.

"**Certificate of Title**" means any "certificate of title", as defined in the UCC.

"**Certificated Security**" has the meaning given in Section 8102 of the UCC from time to time.

"**Chattel Paper**" has the meaning given in the UCC from time to time.

"**Closing Date**" means the date on which all of the conditions precedent to the making of the initial Loans have been met or waived by each Lender.

"**Collateral**" has the meaning given in <u>Section 11.l(a)</u>.

"**Collateral Documents**" means this Agreement, the Pledge Agreement and any mortgages, deeds of trust and other instruments or documents delivered by Debtor pursuant to this Agreement or any of the other Loan Documents in order to grant to Administrative Agent, on behalf of Lenders, a Lien on any real or personal property of Debtor as security for the Obligations.

"**Commercial Tort Claim**" has the meaning given in the UCC from time to time.

"**Commitments**" means the commitment of a Lender to make Loans to Debtor pursuant to <u>Section 2.1(a) and (b)</u> and "**Commitments**" means such commitments of all Lenders in the aggregate, which shall be the lesser of $3,500,000 or the amount required to be advanced pursuant to the Budget, plus amount equal to the Pre-Petition Obligations on the Closing Date.

"**Committee**" means any official committee of unsecured creditors appointed pursuant Section 1102 of the Bankruptcy Code in the Case.

"**Copyright Licenses**" means any written agreement naming Debtor, as licensor or licensee, granting any right under any Copyright, including, without limitation, the grant of rights to manufacture, distribute, exploit and sell materials derived from any Copyright.

"**Copyrights**" means (a) all copyrights arising under the Laws of the United States, any other country or any political subdivision thereof, whether registered or unregistered and whether published or unpublished, all registrations and recordings thereof, and all applications in connection therewith, including, without limitation, all registrations, recordings

and applications in the United States Copyright Office, and (b) the right to obtain all renewals thereof.

"**Debtor**" has the meaning assigned to such term in the introduction to this Agreement.

"**Default**" means a condition or event that, after notice or lapse of time or both, could constitute an Event of Default.

"**Deposit Account**" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"**Documents**" has the meaning given in the UCC from time to time.

"**DIP Facility**" or "**Facility**" means the credit facility contemplated in this Agreement and other Loan Documents.

"**Dollars**" and the sign "**$**" mean the lawful money of the United States of America.

"**EBITDA**" means, for any applicable period of computation, the sum of net income after taxes (excluding any after-tax gains or losses on the sale of assets and excluding other after-tax extraordinary gains or losses), plus (i) interest expense, (ii) income tax expense, (iii) depreciation expense, (iv) amortization expenses, (v) any restructuring charges, and plus or minus (vi) any other non-cash charges or gains which have been added or subtracted in calculating net income after taxes for such period, all as determined in accordance with GAAP.

"**Employee Benefit Plan**" means any "employee benefit plan" as defined in Section 3(3) of ERISA which is or was maintained or contributed to by Debtor or any of its ERISA Affiliates.

"**Environmental Claim**" means any investigation, notice of violation, claim, action, suit, proceeding, demand, abatement order or other order or directive (conditional or otherwise), by any governmental authority or any other Person, arising (a) pursuant to or in connection with any actual, alleged or threatened violation of any Environmental Law, (b) in connection with any Hazardous Materials or any actual, alleged or threatened Hazardous Materials Activity, or (c) in connection with any actual, alleged or threatened damage, injury, threat or harm to health, safety, natural resources or the environment.

"**Environmental Laws**" means any and all federal, state, local, and foreign Laws, concessions, grants, franchises, licenses, agreements, standards, requirements of common law, or governmental restrictions relating to pollution and the protection of human health and the environment, surface or underground mining or the release of any materials into the environment including, without limitation, those related to Hazardous Materials, air emissions and discharges to waste or public systems.

Lehigh Coal - BET Associates DIP Credit Agreement - DP Draft 7-17-09 (2) (2)

"**Equipment**" has the meaning given in the UCC from time to time.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor thereto.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) under common control with Debtor within the meaning of Section 414(b) or (c) of the Internal Revenue Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"**Event of Default**" means each of the events set forth in <u>Section 7</u>.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time, and any successor statute.

"**Farm Products**" has the meaning given in the UCC from time to time.

"**Filing Date**" has the meaning assigned in the recitals to this Agreement.

"**Final Order**" means a final order of the Bankruptcy Court, that, without limitation, approves the DIP Facility and grants the liens and security interests contained herein and therein, which order is not stayed, and is consented to by Lenders.

"**Fiscal Quarter**" means a fiscal quarter of any Fiscal Year.

"**Fiscal Year**" means the fiscal year of Debtor.

"**Fixtures**" means all materials, supplies, equipment, systems, apparatus, and other items now owned or hereafter acquired by Debtor and now or hereafter attached to, installed in, or used in connection with (temporarily or permanently) any Real Property.

"**Foundation Secured Claim**" means that certain secured Pre-Petition Obligation in favor of The Bruce and Robbi Toll Foundation (the "**Foundation**") arising out of or relating to the Indebtedness incurred pursuant to a certain Purchase and Service Agreement dated July 11, 2007 between Debtor and the Foundation, which Pre-Petition Obligation is more fully described on <u>Schedule 2</u> attached hereto, incorporated herein by this reference and made a part hereof.

"**Funding and Payment Office**" means the office of Administrative Agent located at _____.

"**Funding Date**" means the date of the funding of a Loan.

"**GAAP**" means generally accepted accounting principles of the Accounting Principles Board of the American Institute of Certified Public Accountants and the Financial Accounting Standards Board, which are applicable from time to time.

"**General Intangibles**" has the meaning given in the UCC from time to time.

"**Goods**" has the meaning given in the UCC from time to time.

"**Guarantor**" has the meaning assigned to that term in Section 3.1(f).

"**Hazardous Materials**" means the following: (a) any chemical, material or substance at any time defined as or included in the definition of "hazardous substances", "waste", "residual waste", "hazardous wastes", "hazardous materials", "extremely hazardous waste", "acutely hazardous waste", "radioactive waste", "biohazardous waste", "pollutant", "toxic pollutant", "contaminant", "restricted hazardous waste", "infectious waste", "toxic substances", or any other term or expression intended to define, list or classify substances by reason of properties harmful to health, safety or the indoor or outdoor environment (including, without limitation, harmful properties such as ignitability, corosivity, reactivity, carcinogenicity, toxicity, reproductive toxicity, "TCLP toxicity" or "EP toxicity" or words of similar import under any applicable Environmental Laws); and (b) any other chemical, material or substance, exposure to which is prohibited, limited or regulated by any governmental authority or which may or could pose a hazard to the health and safety of the owners, occupants or any Persons in the vicinity of any facility or to the indoor or outdoor environment.

"**Hazardous Materials Activity**" means any past, current, proposed or threatened activity, event or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

"**Indebtedness**" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)     all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)     the maximum amount of all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c)     net obligations of such Person under any swap or similar contract;

(d)     all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business and not past due);

(e)     indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)     all Indebtedness in respect of Capital Leases of such Person;

(g)     all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any equity interest in such Person or any other Person or any warrant, right or option to acquire such equity interest, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; and

(h)     all guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person.  The amount of any net obligation under any swap contract on any date shall be deemed to be the swap termination value thereof as of such date.

"**Indemnified Party**" has the meaning assigned to that term in Section 9.3.

"**Instruments**" has the meaning given in the UCC from time to time.

"**Intellectual Property**" means all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign Laws or otherwise, including, without limitation, the Copyrights, the Copyright Licenses, the Patents, the Patent Licenses, the Trademarks and the Trademark Licenses, and all rights to sue at Law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"**Interim Order**" means an emergency order approved by the Bankruptcy Court entered prior to the date of the Final Order that permits borrowing under the Interim Commitment, which Interim Order is in form and substance satisfactory to Lenders in their sole discretion.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter, and any successor statute.

"**Inventory**" has the meaning given in the UCC from time to time.

"**Investment**" means (a) any direct or indirect purchase or other acquisition by Debtor of, or of a beneficial interest in, stock or other Securities or equity of any other Person, or (b) any direct or indirect loan, advance or capital contribution by Debtor to any other Person, including all Indebtedness and accounts receivable acquired from that other Person that are not current assets or did not arise from sales to that other Person in the ordinary course of business; provided, however, that the term "Investment" shall not include (i) current trade and customer accounts receivable for Goods furnished or services rendered in the ordinary course of business and payable in accordance with customary trade terms or other terms negotiated in good faith on arm's length basis, (ii) advances and prepayments to suppliers for Goods and services in the

ordinary course of business, (iii) stock or other Securities acquired in connection with the satisfaction or enforcement of Indebtedness or claims due or owing to Debtor or as security for any such Indebtedness or claims, (iv) cash held in Deposit Accounts with banks, trust companies, and Lenders, and (v) shares in a mutual fund that invests solely in Cash Equivalents. The amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, writedowns, or write-offs with respect to such Investment.

"**Investment Property**" has the meaning given in the UCC from time to time.

"**Laws**" means all applicable statutes, laws, treaties, ordinances, tariff requirements, rules, regulations, orders, writs, permits, injunctions, decrees, judgments, opinions or interpretations of any governmental authority.

"**Lender**" and "**Lenders**" means the persons identified as "**Lenders**" and listed on the signature pages of this Agreement, together with their successors and permitted assigns pursuant to Section 9.1.

"**Letter-of-Credit Rights**" has the meaning given in the UCC from time to time.

"**Loan Documents**" means this Agreement, the Surety Agreement, the Collateral Documents, and any related instruments, certificates, and agreements entered into from time to time by Debtor for the benefit of Administrative Agent or any Lender.

"**Loan Exposure**" means, with respect to any Lender as of any date of determination (a) prior to the termination of the Commitments, that Lender's Commitment and (b) after the termination of the Commitments, the aggregate outstanding principal amount of Loans of that Lender.

"**Loans**" means the loans made by Lenders to or for the benefit of Debtor pursuant to Section 2.1.

"**Margin Stock**" has the meaning assigned to that term in Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

"**Material Adverse Effect**" means any (a) material impairment of the ability of Debtor to perform any payment or other obligations under any Loan Document, (b) material and adverse effect on the properties, assets or prospects of Debtor including, without limitation, any modification, violation, revocation or suspension of any license or permit and/or authorization or agreement (whether or not having the force of Law) pursuant to which Debtor conducts business, or (c) material adverse effect upon the legality, validity, binding effect, or enforceability against Debtor of any Loan Document to which it is a party; provided that "**Material Adverse Effect**" shall not be deemed to include the impact or effect of (a) changes in GAAP or the interpretations thereof, except to the extent such change has a disproportionate effect on Debtor, taken as a whole, as compared to other Persons in the industry in which Debtor operates, or (b) denial of Debtor's claim in the Bankruptcy Court that the transaction involving the sale by Debtor of the Great Lakes Silt was a fraudulent transfer.

Lehigh Coal - BET Associates DIP Credit Agreement - DP Draft 7-17-09 (2) (2)

"**Moody's**" means Moody's Investors Service, Inc.

"**Multiemployer Plan**" means any Employee Benefit Plan which is a "multiemployer plan" as defined in Section 3(37) of ERISA.

"**Net Cash Proceeds**" means with respect to any Asset Sale, debt or equity issuance, or Casualty Event, cash (including, any cash received by way of deferred payment pursuant to a promissory note or otherwise, but only as and when received) received in connection with and as consideration therefor, on or after the date of consummation of such Asset Sale or debt or equity issuance, or the date of the occurrence of such Casualty Event, by Debtor from such Asset Sale, such debt or equity issuance, or from the receipt of proceeds from any Casualty Event, after (a) deduction of an amount equal to estimated federal, state, and local taxes in connection with such Asset Sale, debt or equity issuance, or Casualty Event and determined in good faith by Debtor, (b) payment of all usual and customary brokerage commissions and all other reasonable fees and expenses related to such Asset Sale or debt or equity issuance (including, without limitation, reasonable attorneys' fees and closing costs incurred in connection with such Asset Sale or debt or equity issuance), (c) deduction of appropriate amounts to be provided by Debtor as a reserve, in accordance with GAAP, against any liabilities retained by Debtor after such Asset Sale, which liabilities are associated with the asset or assets being sold, including, without limitation, pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such Asset Sale, and (d) deduction for the amount of any Indebtedness (other than the Obligations) secured by the respective asset or assets being sold or subject to such Casualty Event, which Indebtedness is required to be repaid as a result of such Asset Sale or Casualty Event.

"**Notes**" has the meaning provided in Section 2.1(e).

"**Notice of Borrowing**" means a notice substantially in the form of **Exhibit A** annexed hereto delivered by Debtor to Administrative Agent pursuant to Section 2.1(c) with respect to a proposed borrowing.

"**Obligations**" means all obligations of every nature of Debtor from time to time owed to Administrative Agent, Lenders or their respective Affiliates or any of them, under the Loan Documents, and for and in connection with the Bridge Note Claims owing Pre-Petition Lenders, it being the intention of the parties to this Agreement that such Pre-Petition Obligations be secured by all Collateral described in the Loan Documents, whether for principal, interest, fees, expenses, indemnification obligations or otherwise.

"**Orders**" means the collective reference to the Interim Order and the Final Order.

"**Participant**" has the meaning provided in Section 9.1(d).

"**Patent License**" means all agreements, whether written or oral, providing for the grant by or to any Debtor of any right to manufacture, use or sell any invention covered in whole or in part by a Patent.

Lehigh Coal - BET Associates DIP Credit Agreement - DP Draft 7-17-09 (2) (2)

"**Patents**" means (a) all letters patent of the United States, any other country or any political subdivision thereof, all reissues and extensions thereof and all goodwill associated therewith, (b) all applications for letters patent of the United States or any other country and all divisions, continuations and continuations-in-part thereof, and (c) all rights to obtain any reissues or extensions of the foregoing.

"**Pension Plan**" means any Employee Benefit Plan, other than a Multiemployer Plan, which is subject to Section 412 of the Internal Revenue Code or Section 302 of ERISA.

"**Person**" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business or statutory trusts or other organizations, whether or not legal entities, and governments (whether federal, state or local, domestic or foreign, and including political subdivisions thereof) and agencies or other administrative or regulatory bodies thereof.

"**Pledge Agreement**" has the meaning provided in Section 3.1(f).

"**Pledged Stock**" means the shares of capital stock of Debtor held by the Guarantor as described in Section 3.1(f).

"**Pre-Petition Lenders**" mean only Lenders as holders of Pre-Petition Obligations.

"**Pre-Petition Collateral**" means all "Collateral" as defined in the Pre-Petition Loan Documents.

"**Pre-Petition Loan Documents**" means the instruments, agreements and documents evidencing and/or securing or credit enhancing the Pre-Petition Obligations.

"**Pre-Petition Obligations**" means all debts, liabilities and obligations of Debtor to Lenders (or any of them) whether direct or indirect, absolute or contingent, joint or several, matured or unmatured, and howsoever acquired by Pre-Petition Lenders, in each case pursuant to and/or as evidenced by the Pre-Petition Loan Documents, including, without limitation, the Foundation Secured Claim, the Bridge Note Claims and the Pre-Sale Claims, but shall not include any debts, liabilities or obligations to creditors other than Lenders.

"**Pre-Sale Claims**" mean certain Pre-Petition Obligations held by one or more Lenders arising from certain Purchase and Service Agreements between Debtor and such Lenders (or predecessors-in-interest to such Lenders) as more fully described on Schedule 3 attached hereto, incorporated herein by this reference and made a part hereof.

"**Pro Rata Share**" means, with respect to any Lender, the percentage obtained by dividing (a) the Loan Exposure of that Lender by (b) the aggregate Loan Exposure of all Lenders, as the applicable percentage may be adjusted by assignments permitted pursuant to Section 9.1. The initial Pro Rata Share of each Lender is set forth opposite the name of that Lender in Schedule 2.1 annexed hereto.

Lehigh Coal - BET Associates DIP Credit Agreement - DP Draft 7-17-09 (2) (2)

"**Proceeds**" means all "proceeds" as such term is defined in Section 9102(a) of the UCC and, in any event, shall include, without limitation, all dividends or other income from the Investment Property, collections thereon or distributions or payments with respect thereto.

"**Real Property**" means any estates or interests in real property now owned or hereafter acquired by Debtor and the improvements thereto.

"**Receivable**" means any right to payment for Goods sold or leased or for services rendered, whether or not such right is evidenced by an Instrument or Chattel Paper and whether or not it has been earned by performance (including, without limitation, any Account).

"**Regulation D**" means Regulation D of the Board of Governors of the Federal Reserve System, as in effect from time to time.

"**Release**" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of Hazardous Materials into the indoor or outdoor environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Materials), including the movement of any Hazardous Materials through the air, soil, surface water or groundwater.

"**Released Parties**" has the meaning assigned in Section 2.6.

"**Releasing Parties**" has the meaning assigned in Section 2.6.

"**Required Lenders**" means Lenders having or holding more than fifty (50%) percent of the sum of the aggregate Loan Exposure of all Lenders.

"**Reserves**" means such reserves as Required Lenders, from time to time determine in their reasonable discretion as being appropriate, including, without limitation, the Carve-Outs.

"**Responsible Officer**" means the chief executive officer, president, chief financial officer, controller, vice president or secretary of Debtor, but in any event, with respect to financial matters, the chief financial officer of Debtor.

"**Rolling Stock**" means all trucks, trailers, tractors, forklifts, converter dolleys, hostlers, automobiles, motor vehicles and other mobile Equipment.

"**S&P**" means Standard and Poors Rating Services, a division of the McGraw-Hill Companies, Inc.

"**Securities**" means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in

Lehigh Coal - BET Associates DIP Credit Agreement - DP Draft 7-17-09 (2) (2)

temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time, and any successor statute.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than fifty (50%) percent of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof.

"**Surety Agreement**" has the meaning assigned in Section 3.1(f).

"**Tax**" or "**Taxes**" means any present or future tax, levy, impost, duty, charge, fee, deduction or withholding of any nature and whatever called, by whomsoever, on whomsoever and wherever imposed, levied, collected, withheld or assessed, and all interest, penalties or similar liabilities with respect thereto; provided that "Tax on the overall net income" of a Person shall be construed as a reference to a tax imposed by the jurisdiction in which that Person is organized or in which that Person's principal office (and/or, in the case of a Lender, its lending office) is located or in which that Person (and/or, in the case of a Lender, its lending office) is deemed to be doing business on all or part of the net income, profits or gains (whether worldwide, or only insofar as such income, profits or gains are considered to arise in or to relate to a particular jurisdiction, or otherwise) of that Person (and/or, in the case of a Lender, its lending office).

"**Termination Date**" means the earliest of the following: (a) December 31, 2009; (b) the earlier of (i) the date upon which the Interim Order expires or (ii) thirty (30) days after the entry of the Interim Order, in either case, if the Final Order has not been entered prior to the expiration of such period, (c) if a plan of reorganization has been confirmed by order of the Bankruptcy Court, the earlier of (i) the effective date of such plan of reorganization or (ii) thirty (30) days after the date of entry of the confirmation order; (d) acceleration by Administrative Agent at the direction of Lenders of the Obligations due to the occurrence of an Event of Default; (e) the indefeasible payment in full of all Obligations owing under the DIP Facility in accordance with the terms hereof; (f) the date which is the closing date of any sale of all or substantially all of Debtor's assets or equity; (g) the entry of an order by the Bankruptcy Court granting relief from the automatic stay permitting foreclosure of any material assets of Debtor, unless such relief is sought by Administrative Agent or any Lender; or (h) the date on which (i) any of the Case shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, (ii) a trustee under Chapter 11 of the Bankruptcy Code shall be appointed in any of the Case, or (iii) an examiner having enlarged powers relating to the operation of the business of Debtor or any Guarantor (beyond those set forth under Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed.

Lehigh Coal - BET Associates DIP Credit Agreement - DP Draft 7-17-09 (2) (2)

"**Trademark License**" means any agreement, whether written or oral, providing for the grant by or to any Debtor of any right to use any Trademark.

"**Trademarks**" means all trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, logos and other source or business identifiers, and all goodwill associated therewith, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and (b) all applications in connection therewith, whether in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country or any political subdivision thereof, or otherwise, and all common-law rights related thereto.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the Commonwealth of Pennsylvania; provided that if, with respect to any financing statement or by reason of any mandatory provisions of Law, the perfection or the effect of perfection or non-perfection of the security interests granted to Administrative Agent pursuant to this Agreement is governed by the Uniform Commercial Code as in effect in a jurisdiction of the United States other than the Commonwealth of Pennsylvania, UCC means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions of this Agreement and any financing statement or other document relating to such perfection or effect of perfection or non-perfection.

    **1.2**    **Accounting Terms**.    Except as otherwise expressly provided herein, all accounting and financial terms used in the Loan Documents and the compliance with each financial covenant therein shall be determined in accordance with GAAP, and all accounting principles shall be applied on a consistent basis so that the accounting principles in a current period are comparable in all material respects to those applied during the preceding comparable period.

    **1.3**    **Rules of Construction**.  Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference.  References to "sections" and "subsections" shall be to sections and subsections, respectively, of this Agreement unless otherwise specifically provided.  The use herein of the word "include" or "including", when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter.

## SECTION 2.
## AMOUNTS AND TERMS OF COMMITMENTS AND LOANS

    **2.1**    **Loans**.

    (a)    **Commitments**.  Subject to the terms and conditions of this Agreement, and in reliance upon the representations and warranties of the Debtor herein set forth, each

Lehigh Coal - BET Associates DIP Credit Agreement - DP Draft 7-17-09 (2) (2)

Case 5:08-bk-51957-JJT    Doc 639-1    Filed 07/21/09    Entered 07/21/09 17:59:51
Desc Exhibit A    Page 22 of 71

Lender severally agrees to make loans to Debtor, from time to time, in an aggregate amount not exceeding its Pro Rata Share of the difference of (A) the Commitments minus (B) the Reserves, in each case, to be used in accordance with the applicable Order and as specifically set forth in the Budget; provided, however, that after giving effect to any Loans, (i) the total utilization of Commitments of all Lenders shall not exceed the aggregate Commitments minus the Reserves, and (ii) the aggregate Loans of any Lender shall not exceed such Lender's Commitment as set forth on Schedule 2.1. The original amount of each Lender's Commitment is set forth opposite its name on the signature page(s) to this Agreement. In no event shall Debtor request, and no Lender shall be required to make, any Loans in an aggregate principal amount greater than the amount approved by the Bankruptcy Court pursuant to the Interim Order or, when applicable, the Final Order or otherwise not strictly in accordance with the Budget. No amounts borrowed under this Section 2 may be re-borrowed; this is not a revolving Loan Facility. Notwithstanding anything to the contrary in any of the Loan Documents, until entry of the Final Order, the maximum amount to be borrowed hereunder shall not exceed the Interim Commitment.

(b)     **Initial Advance to Satisfy Certain Pre-Petition Obligations.**  Subject to satisfaction of all conditions precedent to Closing, concurrently therewith, (i) to refinance (using Loans hereunder) the Bridge Note Claims and the Foundation Secured Claim and (ii) to repurchase or pre-pay the Pre-Sale Claims, Lenders shall make an advance to Pre-Petition Lenders in the amount of $_____, which amount is hereby confirmed to be the aggregate outstanding principal balance of such Pre-Petition Obligations (the "**Initial Advance**"). Such Initial Advance shall constitute a Loan hereunder and shall be payable in accordance with the terms and subject to the conditions set forth herein and in the other Loan Documents, and shall be secured by all Collateral.

(c)     **Borrowing Mechanics**.  Loans made on any Funding Date after the date hereof shall be in an aggregate minimum amount of $100,000 and in an integral multiple of $50,000 in excess thereof. Each request for Loans hereunder shall be made by a notice in the form attached hereto as **Exhibit A** from Debtor to Administrative Agent (a "**Notice of Borrowing**"), given not later than 12:00 P.M. two (2) Business Days prior to the date of the requested borrowing of Loans. Each Notice of Borrowing shall be given by telecopy setting forth (1) the requested date of such borrowing, (2) the amount of such requested borrowing, (3) certification by the Debtor that it has complied in all respects with Sections 3.1 and 3.2, all of which shall be specified in such manner as is necessary to comply with all limitations on Loans outstanding hereunder, and (4) the account at which such requested funds should be made available. Each Notice of Borrowing shall be irrevocable by and binding on Debtor.

(d)     **Disbursement of Funds**.  The Initial Advance under Section 2.1(b) and all Loans under this Agreement shall be made by Lenders simultaneously and in proportion to their respective Pro Rata Shares, it being understood that no Lender shall be responsible for any default by any other Lender in that other Lender's obligation to make a Loan requested hereunder, nor shall the Commitment of any Lender to make the particular Loan requested be increased or decreased as a result of a default by any other Lender in that other Lender's obligation to make a Loan requested hereunder. Promptly after receipt by Administrative Agent of a Notice of Borrowing pursuant to Section 2.1(c), Administrative Agent shall notify each Lender of the proposed borrowing. Each Lender shall make the amount of its Loan available to

Administrative Agent not later than 11:00 A.M. (New York time) on the applicable Funding Date, in immediately available funds in Dollars, at the Funding and Payment Office. Upon satisfaction or waiver of the conditions precedent specified in Sections 3.1 (in the case of Loans made on the Closing Date) and 3.2 (in the case of all Loans), Administrative Agent shall make the proceeds of such Loans available to Debtor on the applicable Funding Date by causing an amount of immediately available funds in Dollars equal to the proceeds of all such Loans received by Administrative Agent from Lenders to be credited to the account of Debtor at the Funding and Payment Office.

Unless Administrative Agent shall have been notified by any Lender prior to the Funding Date for any Loans that such Lender does not intend to make available to Administrative Agent the amount of such Lender's Loan requested on such Funding Date, Administrative Agent may assume that such Lender has made such amount available to Administrative Agent on such Funding Date and Administrative Agent may, in its sole discretion, but shall not be obligated to, make available to Debtor a corresponding amount on such Funding Date. If such corresponding amount is not, in fact, made available to Administrative Agent by such Lender, Administrative Agent shall be entitled to recover such corresponding amount on demand from such Lender, together with interest thereon, for each day from such Funding Date until the date such amount is paid to Administrative Agent at the customary rate set by Administrative Agent for the correction of errors among banks for three (3) Business Days and thereafter at the rate set forth in Section 2.2(a). If such Lender does not pay such corresponding amount forthwith upon Administrative Agent's demand therefor, Administrative Agent shall promptly notify Debtor and Debtor shall immediately pay such corresponding amount to Administrative Agent, together with interest thereon at the rate accruing on the Loans as set forth herein, for each day from such Funding Date until the date such amount is paid to Administrative Agent. Nothing in this Section 2.1(d) shall be deemed to relieve any Lender from its obligation to fulfill its Commitment hereunder or to prejudice any rights that Debtor may have against any Lender as a result of any default by such Lender hereunder.

(e)     **Notes**. The obligations to repay the Loans and to pay interest thereon shall be evidenced by promissory notes of Debtor to each Lender, in form and substance acceptable to Administrative Agent (each a "**Note**" and collectively, the "**Notes**"), payable to the order of each Lender in a principal amount equal to such Lender's Commitment and representing the Obligations of Debtor to pay Lenders the amount of such Commitment or, if less, the aggregate unpaid principal amount of all Loans made by Lenders hereunder, plus interest accrued thereon, as set forth herein. Debtor irrevocably authorizes Lenders to make or cause to be made appropriate notations on the Notes, or on a record pertaining thereto, reflecting Loans and repayments thereof. The outstanding amount of the Loans set forth on the Notes or such record shall be prima facie evidence of the principal amount thereof owing and unpaid to Lenders, but the failure to make such notation or record, or any error in such notation or record shall not limit or otherwise affect the obligations of Debtor hereunder or under the Notes to make payments of principal of or interest on the Notes when due.

Lehigh Coal - BET Associates DIP Credit Agreement - DP Draft 7-17-09 (2) (2)

**2.2**    **Interest on the Loans**.

(a)    **Rate of Interest on Loans**.  Subject to the provisions of Sections 2.3(b) and (c), each Loan shall bear interest on the unpaid principal amount thereof from the date made until repaid at the fixed rate per annum of eleven (11%) percent.

(b)    **Post-Default Interest**.    To the extent permitted by Law, upon the occurrence and during the continuance of an Event of Default, all Obligations shall bear interest from the date of such Event of Default and during the continuance thereof at the applicable interest rate plus two (2%) percent per annum (the "**Default Rate**") until paid.  Such interest shall be due and payable on demand.

(c)    **Computation of Interest**.  Interest on the Loans shall be computed on the basis of a 360-day year, for the actual number of days elapsed in the period during which it accrues. All interest rate determinations and calculations by Administrative Agent are conclusive and binding absent manifest error.

**2.3**    **Fees**.

(a)    **Upfront Fee**.    Debtor agrees to pay to Administrative Agent for distribution to each Lender in proportion to that Lender's Pro Rata Share, an upfront fee in the amount of $60,000 (the "**Upfront Fee**").  The Upfront Fee shall be due and payable on the Closing Date.

(b)    **Administrative Fee**.    Debtor shall pay to Administrative Agent for distribution to each Lender in proportion to that Lender's Pro Rata Share, an administrative fee in the amount of $30,000 (the "**Administrative Fee**").  The Administrative Fee shall be due and payable on the Closing Date.

(c)    **Audits and Appraisals Fee**.    With respect to those inspections and collateral audits conducted under Section 5.4, Debtor shall pay for the separate account of Lenders, audit, appraisal, and valuation fees and charges, a fee of $2,500 per day for auditors conducting financial audits or examinations, plus all out-of-pocket expenses for each financial audit of Debtor and for any collateral examinations performed by personnel of Administrative Agent or personnel employed by Administrative Agent.

(d)    **Fees Earned**.  All fees payable to Administrative Agent or any Lender by Debtor hereunder or pursuant to any other agreement executed in connection herewith shall be fully earned when due hereunder or thereunder and shall be non-refundable in all circumstances.

**2.4**    **Repayments of Loans**.

(a)    **Prepayments of Loans**.

(i)    Voluntary Prepayments.    Debtor may, upon prior written or telephonic notice given to Administrative Agent by 12:00 noon (Philadelphia, PA time) on the date of the proposed prepayment and, if given by telephone, promptly confirmed in writing to

Lehigh Coal - BET Associates DIP Credit Agreement - DP Draft 7-17-09 (2) (2)

Administrative Agent (which original written or telephonic notice Administrative Agent will promptly transmit by facsimile or telephone to each Lender), at any time and from time to time prepay any Loans on any Business Day in whole or in part in an aggregate minimum amount of $50,000 and integral multiples of $50,000. Notice of prepayment having been given as aforesaid, the principal amount of the Loans specified in such notice shall become due and payable on the prepayment date specified therein. Any such voluntary prepayment shall be applied to reduce the outstanding principal balance of the Loans. No Loans prepaid may be re-borrowed.

(ii)    <u>Mandatory Prepayments</u>.

(A)    Debtor shall from time to time repay the Loans to the extent necessary so that the outstanding principal Obligations shall not at any time exceed the Commitments then in effect.

(B)    Until such time as the Obligations have been repaid in full, the Obligations shall be permanently prepaid immediately upon receipt by Debtor of Net Cash Proceeds of any Asset Sale (in one or a series of related transactions), the incurrence of any Indebtedness, or Casualty Event in an amount equal to all such Net Cash Proceeds.

(C)    All mandatory prepayments of the Loans shall be allocated to each Lender pursuant to such Lender's Pro Rata Share and shall be allocated first to any accrued and unpaid interest through the date of such prepayment, and second to the Loans (and otherwise in accordance with <u>Section 11.3(d)</u>. The Commitments shall be permanently reduced by the amount of the Loans so prepaid under this <u>Section 2.4(a)(ii)</u>.

(b)    **Repayment of Loans**. Debtor agrees to repay in full all outstanding principal amounts of all the Loans, and the Commitments, whether or not fully utilized, shall automatically terminate and be permanently reduced to zero, on the Termination Date.

(c)    **General Provisions Regarding Payments**.

(i)    <u>Manner and Time of Payment</u>. All payments by Debtor of principal, interest, fees and other Obligations hereunder shall be made in Dollars in immediately available funds, without defense, setoff or counterclaim, free of any restriction or condition, and delivered to Administrative Agent not later than 1:00 P.M. (Philadelphia, PA time) on the date due at the Funding and Payment Office for the account of Lenders; funds received by Administrative Agent after that time on such due date shall be deemed to have been paid by Debtor on the next succeeding Business Day.

(ii)    <u>Apportionment of Payments</u>. Administrative Agent shall promptly distribute to each Lender, at its primary address set forth below its name on the appropriate signature page hereof or at such other address as such Lender may request, its Pro Rata Share of all such payments received by Administrative Agent and the fees of such Lender when received by Administrative Agent pursuant to <u>Sections 2.3</u> and <u>2.4</u>.

    (iii) <u>Payments on Business Days</u>.  Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder or of the commitment fees hereunder, as the case may be.

   **2.5** **<u>Use of Proceeds</u>**.  The proceeds of any Loans shall be used solely in accordance with (i) the applicable Order, (ii) to refinance, repurchase, pay or prepay, as the case may be, the Pre-Petition Obligations in accordance with the terms of this Agreement, and (iii) to fund working capital requirements of the Debtor, operating expenses of the Debtor, capital expenditures and other line items strictly in accordance with and as expressly set forth in the terms of the Budget.  Except as expressly set forth in <u>Section 5.2</u>, there shall be no reallocation of any amount and/or any line item of the Budget or any deviation from the Budget without the express written consent of all Required Lenders, and any request for same shall be in writing.

   **2.6** **<u>Release</u>**.  Debtor acknowledges that Debtor does not have any defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all or any part of Debtor's liability to repay any Pre-Petition Lender, Administrative Agent or any Lender as provided in under this DIP Facility or to seek affirmative relief or damages of any kind or nature from Administrative Agent or any Lender.  Debtor, for itself and for its bankruptcy estate, and on behalf of all their successors, assigns, Subsidiaries and any Affiliates and any Person acting for and on behalf of, or claiming through them (collectively, the "**<u>Releasing Parties</u>**"), hereby fully, finally and forever releases and discharges any Pre-Petition Lender, Administrative Agent, Lenders and all of the past and present officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, and each Person acting for or on behalf of any of them (collectively, the "**<u>Released Parties</u>**") of and from any and all past, present, and future actions, causes of actions, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in Law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and in each case, which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to this Agreement, the Orders and the transactions contemplated hereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing.

Lehigh Coal - BET Associates DIP Credit Agreement - DP Draft 7-17-09 (2) (2)

**2.7**     <u>Increased Costs; Taxes; Capital Adequacy</u>.

      (a)     **Compensation for Increased Costs and Taxes**. Subject to the provisions of <u>Section 2.7(b)</u> (which shall be controlling with respect to the matters covered thereby), in the event that any Lender shall determine (which determination shall, absent demonstrable error, be final and conclusive and binding upon all parties hereto) that any Law, treaty or governmental rule, regulation or order, or any change therein or in the interpretation, administration or application thereof (including the introduction of any new Law, treaty or governmental rule, regulation or order), or any determination of a court or governmental authority, in each case that becomes effective after the date hereof, or compliance by such Lender with any guideline, request or directive issued or made after the date hereof by any central bank or other governmental or quasi-governmental authority (whether or not having the force of Law):

      (i)     subjects such Lender directly or indirectly to any additional Tax (other than any Tax on the overall net income of such Lender, franchise tax or gross receipts tax) with respect to this Agreement or any of its obligations hereunder or any payments to such Lender (or its applicable lending office) of principal, interest, fees or any other amount payable hereunder;

      (ii)     imposes, modifies or holds applicable any reserve (including any marginal, emergency, supplemental, special or other reserve), special deposit, compulsory loan, FDIC insurance or similar requirement against assets held by, or deposits or other liabilities in or for the account of, or advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of such Lender; or

      (iii)     imposes any other condition (other than with respect to a Tax matter) on or affecting such Lender (or its applicable lending office) or its obligations hereunder; and the result of any of the foregoing is to increase the cost to such Lender of agreeing to make, making or maintaining Loans hereunder or to reduce any amount received or receivable by such Lender (or its applicable lending office) with respect thereto;

then, in any such case, Debtor shall within ten (10) Business Days pay to such Lender, upon receipt of the statement referred to in the next sentence, such additional amount or amounts (in the form of an increased rate of, or a different method of calculating, interest or otherwise as such Lender in its sole discretion shall determine) as may be necessary to compensate such Lender for any such increased cost or reduction in amounts received or receivable hereunder. Such Lender shall deliver to Debtor (with a copy to Administrative Agent) a written statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to such Lender under this <u>Section 2.7(a)</u>, which statement shall be conclusive and binding upon all parties hereto absent manifest error.

      Promptly after any Lender has determined, in its sole judgment, that it will make a request for increased compensation pursuant to this <u>Section 2.7(a)</u>, such Lender will notify Debtor thereof. Failure on the part of any Lender so to notify Debtor or to demand compensation for any increased costs or reduction in amounts received or receivable or reduction in return on capital with respect to any period shall not constitute a waiver of such Lender's right to demand

compensation with respect to such period or any other period; provided that Debtor shall not be under any obligation to compensate any Lender with respect to increased costs or reductions with respect to any period prior to the date that is six months prior to such request if such Lender knew of the circumstances giving rise to such increased costs or reductions and of the fact that such circumstances would in fact result in a claim for increased compensation by reason of such increased costs or reductions; and provided, further, that the foregoing limitation shall not apply to any increased costs or reductions arising out of the retroactive application of any Law, regulation, rule, guideline or directive as aforesaid within such six-month period.

    (b)    **Withholding of Taxes**.

    (i)    <u>Payments to Be Free and Clear</u>.  All sums payable by Debtor under this Agreement and the other Loan Documents shall (except to the extent required by Law) be made without setoff, counterclaim or other defense and free and clear of, and without any deduction or withholding on account of, any Tax (other than a Tax on the overall net income of any Lender, franchise tax, or gross receipts tax) imposed, levied, collected, withheld or assessed by or within the United States of America or any political subdivision in or of the United States of America or any other jurisdiction from or to which a payment is made by or on behalf of Debtor or by any federation or organization of which the United States of America or any such jurisdiction is a member at the time of payment.

    (ii)    <u>Grossing-up of Payments</u>.  If Debtor or any other Person is required by Law to make any deduction or withholding on account of any such Tax from any sum paid or payable by Debtor or a Guarantor to or on behalf of Administrative Agent or any Lender under any of the Loan Documents:

    (A)    Debtor shall notify Administrative Agent of any such requirement or any change in any such requirement as soon as Debtor becomes aware of it;

    (B)    Debtor shall pay any such Tax to the relevant taxing authority before the date on which penalties attach thereto, such payment to be made (if the liability to pay is imposed on Debtor) for its own account or (if that liability is imposed on Administrative Agent or such Lender, as the case may be) on behalf of and in the name of Administrative Agent or such Lender;

    (C)    the sum payable by Debtor in respect of which the relevant deduction, withholding or payment is required shall be increased to the extent necessary to ensure that, after the making of that deduction, withholding or payment, Administrative Agent or such Lender, as the case may be, receives on the due date a net sum equal to what it would have received had no such deduction, withholding or payment been required or made;

    (D)    within thirty (30) days after paying any sum from which it is required by Law to make any deduction or withholding, and in any event within thirty (30) days after the due date of payment of any Tax which it is required by <u>clause (B)</u> above to pay, Debtor shall deliver to Administrative Agent evidence satisfactory to the other affected parties of such deduction, withholding or payment and of the remittance thereof to the relevant taxing or

Lehigh Coal - BET Associates DIP Credit Agreement - DP Draft 7-17-09 (2) (2)

Case 5:08-bk-51957-JJT    Doc 639-1    Filed 07/21/09    Entered 07/21/09 17:59:51
Desc Exhibit A    Page 29 of 71

other authority, including a copy of the official receipt (or a certified copy thereof), provided that no such additional amount shall be required to be paid to any Lender under <u>clause (C)</u> above except to the extent that any change after the date hereof (in the case of each Lender listed on the signature pages hereof) or after the date of the Assignment Agreement pursuant to which such Lender became a Lender (in the case of each other Lender) in any such requirement for a deduction, withholding or payment as is mentioned therein shall result in an increase in the rate of such deduction, withholding or payment from that in effect at the date of this Agreement or at the date of such Assignment Agreement, as the case may be, in respect of payments to such Lender; and

        (E)     Debtor shall indemnify Administrative Agent and each Lender for any Taxes (other than Taxes on the overall net income of any Lender, franchise tax, and gross receipts tax) levied, imposed or assessed on (and whether or not paid directly by) Administrative Agent or such Lender (and whether or not such Taxes are correctly or legally asserted by the relevant taxing authority) in connection with this Agreement or the Obligations. Promptly upon having knowledge that any such Taxes have been levied, imposed or assessed, and promptly upon notice thereof by Administrative Agent or any Lender, Debtor shall pay such Taxes directly to the relevant taxing authority (<u>provided</u>, <u>however</u>, that neither Administrative Agent nor any Lender shall be under any obligation to provide any such notice to Debtor). In addition, Debtor shall indemnify Administrative Agent and each Lender for such incremental Taxes that may become payable by Administrative Agent or any Lender as a result of any failure of Debtor to pay such Taxes when due to the appropriate authority or to deliver to Administrative Agent, pursuant to <u>clause (D)</u> of this <u>Section 2.7(b)(ii)</u>, documentation evidencing the payment of such Taxes. With respect to indemnification for such Taxes (other than Taxes on the overall net income of any Lender, franchise tax or gross receipts tax) actually paid by Administrative Agent or any Lender or the indemnification provided in the immediately preceding sentence, such indemnification shall be made within thirty (30) days after the date Administrative Agent or such Lender, as the case may be, makes written demand therefor. Debtor acknowledges that any payment made to Administrative Agent or any Lender or to any taxing authority in respect of the indemnification obligations of Debtor provided in this clause shall constitute a payment in respect of which the provisions of <u>Section 2.7(b)(i)</u>, <u>2.7(b)(ii)(A)</u>, <u>(B)</u>, <u>(C)</u> and this <u>clause (E)</u> shall apply.

        (c)     **Capital Adequacy Adjustment**. If any Lender shall have determined that the adoption, effectiveness, phase-in or applicability after the date hereof of any Law (or any provision thereof) regarding capital adequacy, or any change therein or in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by any Lender (or its applicable lending office) with any guideline, request or directive regarding capital adequacy (whether or not having the force of Law) of any governmental authority, central bank or comparable agency, in each case that become effectives after the date hereof, has or would have the effect of reducing the rate of return on the capital of such Lender or any corporation controlling such Lender as a consequence of, or with reference to, such Lender's Loans or Commitments or participations therein or other obligations hereunder with respect to the Loans to a level below that which such Lender or such controlling corporation could have achieved but for such adoption, effectiveness, phase-in, applicability, change or compliance (taking into

Lehigh Coal - BET Associates DIP Credit Agreement - DP Draft 7-17-09 (2) (2)

consideration the policies of such Lender or such controlling corporation with regard to capital adequacy), then from time to time, within ten (10) Business Days after receipt by Debtor from such Lender of the statement referred to in the next sentence, Debtor shall pay to such Lender such additional amount or amounts as will compensate such Lender or such controlling corporation on an after-tax basis for such reduction. Such Lender shall deliver to Debtor (with a copy to Administrative Agent) a written statement, setting forth in reasonable detail the basis of the calculation of such additional amounts, which statement shall be conclusive and binding upon all parties hereto absent demonstrable error.

## SECTION 3.
## CONDITIONS TO LOANS

    **3.1**   <u>**Effectiveness**</u>. This Agreement shall not become effective and Lenders shall not be obligated to advance any Loans, unless Administrative Agent has received the following (each, unless otherwise noted, dated the Closing Date):

    (a)   **Documentation**.

    (i)   Copies of the Articles of Incorporation of Debtor, certified as of the Closing Date by a Responsible Officer;

    (ii)   Resolutions of the Board of Directors of Debtor approving and authorizing the execution, delivery and performance of the Loan Documents to which it is a party, and the borrowings and/or guaranties made hereunder, each in form and substance satisfactory to Administrative Agent, certified as of the Closing Date by a Responsible Officer of Debtor as being in full force and effect without modification or amendment;

    (iii)   Signature and incumbency certificates of the officers of Debtor executing the Loan Documents to which it is a party which certificates shall be executed by a Responsible Officer of Debtor; and

    (iv)   Executed originals of each Loan Document to which Debtor and/or Guarantor is a party.

    (b)   **Budget**. Administrative Agent and Lenders shall have received and approved the Budget.

    (c)   **Final Order**. Subject to <u>Section 3.3</u>, entry of a Final Order by the Bankruptcy Court within thirty (30) days following entry of an Order approving the DIP Facility, which Final Order shall not have been modified or amended without approval of Lenders, and shall not have been reversed or stayed pending appeal, and shall otherwise be in form and substance satisfactory to Lenders in their sole discretion.

    (d)   **Fees**. Debtor shall have paid to Administrative Agent an amount equal to the estimated reasonable costs and out-of-pocket expenses of Administrative Agent's and Lenders' respective counsel incurred in connection with the preparation, execution and delivery of the Loan Documents and the consummation of the transactions contemplated thereby.

(e) **Perfection Certificates**. Administrative Agent shall have received an executed Perfection Certificate, in a form reasonably acceptable to Administrative Agent, from Debtor.

(f) James J. Curran, Jr., the holder of all issued and outstanding shares of stock of Debtor ("**Guarantor**"), pursuant to a Surety Agreement to be executed and delivered by Guarantor concurrently with the execution and exchange of this Agreement (the "**Surety Agreement**"), shall guarantee, as a surety, all existing and future debts, liabilities and obligations of Debtor to Lenders and Administrative Agent and, pursuant to a Pledge Agreement to be executed and delivered by Guarantor to Administrative Agent concurrently herewith (the "**Pledge Agreement**"), secure his obligations as a surety under the Surety Agreement, pledge and grant a security interest to Administrative Agent in all existing and future issued and outstanding shares of all classes of capital stock of Debtor, all as more fully described in such Pledge Agreement.

(g) Debtor and Guarantor shall furnish to Administrative Agent such data and information (financial and other) as Administrative Agent may request in connection with the assets and operations of Debtor including, without limitation, all licenses, permits, approvals and authorizations to conduct its business as it is currently conducted and as contemplated to be conducted during the Case, all evidence of right, title and ownership in and to its assets and all intellectual property and other general intangibles (in whatever form such information may be available or recorded, including in machine language or other digital format).

(h) Debtor shall execute and/or deliver to Administrative Agent, to be held by Administrative Agent in escrow until the occurrence of any Event of Default, a deed in lieu of foreclosure for all Real Property owned by Debtor or in which Debtor has an interest, together with any and all related instruments, agreements and documents required by Administrative Agent to enable Administrative Agent to record such deed in lieu of foreclosure to convey to Administrative Agent or its designee or assignee such Real Property and improvements of Debtor, together with a bill of sale in lieu of foreclosure with respect to all personal property of Debtor. The foregoing shall not be in limitation of any other rights and remedies which Administrative Agent or Lenders may have at law or in equity against Debtor or Guarantor at law or in equity upon the occurrence of any Event of Default. In addition, Debtor shall also execute and/or deliver to Administrative Agent to be held by Administrative Agent until the occurrence of any Event of Default an answer in mortgage foreclosure with respect to the mortgage(s) securing the Obligations. The deed in lieu of foreclosure, the bill of sale in lieu of foreclosure, the answer in mortgage foreclosure and all related instruments, agreements and documents may be recorded, filed or utilized as Administrative Agent may deem appropriate to effect the transfer of Collateral to Administrative Agent or its designee upon the occurrence of any Event of Default.

**3.2** **All Borrowings**. The obligation of Lenders to make any Loans under this Agreement (including the initial Loan) shall be subject to the conditions precedent that, as of the Funding Date and after giving effect thereto:

(a) **No Default**. There exists no Default or Event of Default.

Lehigh Coal - BET Associates DIP Credit Agreement - DP Draft 7-17-09 (2) (2)

(b) **No Material Adverse Effect**. Since the date hereof, no event, change or development has occurred which has had, or could reasonably be expected to have, a Material Adverse Effect.

(c) **Notice of Borrowing**. Administrative Agent shall have received from Debtor a Notice of Borrowing in accordance with Section 2.1(c) and all of the statements contained in such Notice of Borrowing shall be true and correct.

(d) **Representations and Warranties**. The representations and warranties contained in each of the Loan Documents shall be true in all material respects as though made on the Funding Date.

(e) **Amount**. The amount of the requested Loan is within and consistent with the Budget.

(f) **Evidence of Budget Compliance.** Evidence satisfactory to Administrative Agent in its sole and absolute discretion that the proceeds of any requested Loan will be used strictly in accordance with the Budget.

(g) **Real Estate Taxes.** Evidence satisfactory that all real estate Taxes currently due are paid and satisfied in full to the extent that the payment of such Taxes is permitted under the Bankruptcy Code or by the Bankruptcy Court.

**3.3** **Interim Borrowing**. Notwithstanding anything to the contrary, to the extent that the Bankruptcy Court shall have entered an Order approving the DIP Facility, the super-priority claims and status and all Liens securing the DIP Facility and containing such other orders and findings as Lenders may reasonably request, which Interim Order shall not have been modified or amended without approval of Lenders, and shall not have been reversed or stayed pending appeal, and otherwise shall be in form and substance satisfactory to Lenders, and all of the other conditions to an advance under Sections 3.1 and 3.2 have been satisfied, other than Section 3.1(c), then Lenders shall be obligated to make loans to Debtor in accordance with Section 2.1.

## SECTION 4.
## REPRESENTATIONS AND WARRANTIES

In order to induce Administrative Agent and Lenders to enter into this Agreement and Lenders to make the Loans, Debtor represents and warrants to Administrative Agent and each Lender, on the date of this Agreement and on each Funding Date that the following statements are true, correct and complete:

**4.1** **Organization and Good Standing**. Debtor is a corporation duly organized and in good standing under the Laws of the State of its organization, is duly qualified as a foreign corporation and is subsisting or in good standing in all states in which it is doing business except where the failure to be so qualified and in good standing could not reasonably be expected to have a Material Adverse Effect, and has the limited liability company power and authority to own its properties and assets and to transact the business in which it is engaged in each jurisdiction in which it operates.

Lehigh Coal - BET Associates DIP Credit Agreement - DP Draft 7-17-09 (2) (2)

**4.2** **Authorization and Power**.  Debtor has full power and authority to execute, deliver and perform the Loan Documents to which it is a party, all of which have been duly authorized by all proper and necessary corporate action.  The Interim Order is effective pursuant to its terms, and the Final Order, upon its entry by the Court, is effective pursuant to its terms.

**4.3** **No Conflicts or Consents**.  Neither the execution and delivery of the Loan Documents, nor the consummation of any of the transactions therein contemplated, nor compliance with the terms and provisions thereof, will contravene or materially conflict with any provision of Law to which such Debtor is subject, any license applicable to such Debtor, any indenture, loan agreement, mortgage, deed of trust, or other agreement or instrument binding on such Debtor (other than the Pre-Petition Loan Documents and other documents relating to pre-petition obligations) or any provision of the charter, or bylaws, regulations, or other organizational documents of such Debtor.  No consent, approval, authorization or order of any court, governmental authority, member, stockholder or third party is required in connection with the execution, delivery or performance by such Debtor of any of the Loan Documents, other than entry and continued effectiveness of the Orders.

**4.4** **Enforceable Obligations**.  The Loan Documents to which Debtor is a party have been duly executed and delivered by Debtor, and are the legal and binding obligations of Debtor, enforceable in accordance with their respective terms.

**4.5** **No Liens**.  Other than (i) Liens in favor of the United States Department of Agriculture and other creditors set forth on Schedule 4 attached hereto which Liens are subject and subordinate to the Liens of the Administrative Agent pursuant to this Agreement, and (ii) Liens permitted under Section 6.2, all of the properties and assets of Debtor are free and clear of all Liens and other adverse claims of any nature, and Debtor has good and marketable title to such properties and assets it owns or purports to own.

**4.6** **Interim and Final Orders**.  As of the date of the making by Lenders of the initial Loan hereunder, the Interim Order has been entered and has not been stayed, amended, vacated, reversed, rescinded or otherwise modified in any respect without the consent of Lenders.  As of the date of the making of any subsequent Loan, the Interim Order and/or the Final Order, as the case may be, have been entered and have not been stayed, amended, reversed, vacated, rescinded or otherwise modified (except in accordance with the terms hereof) in any respect.

**4.7** **No Default**.  No event has occurred and is continuing which constitutes a Default or an Event of Default.

**4.8** **Use of Proceeds; Margin Stock**.  None of proceeds of the Loans will be used for the purpose of purchasing or carrying any "margin stock" as defined in Regulations T, U or X of the Board of Governors of Governors of the Federal Reserve System or for any other purpose which might constitute this transaction a "purpose credit" within the meaning of such Regulations.  If requested by Administrative Agent, Debtor will furnish to Administrative Agent a statement in conformity with the requirements of the Federal Reserve Form U-I referred to in said Regulation U to the foregoing effect.

**4.9     Principal Office, Etc.**   The principal office, chief executive office, principal place of business and jurisdiction of formation of Debtor are set forth on Schedule 11.l(b) hereto.

**4.10     Compliance with Law**.   Debtor is in compliance in all material respects with all Laws (including all Environmental Laws) which are applicable to Debtor, or its properties.

**4.11     Subsidiaries**.   Debtor has no Subsidiaries.

**4.12     Collateral Documents; Description and Location of Assets**.   The Collateral Documents contain a description of all of the Collateral sufficient to grant to Administrative Agent (for the ratable benefit of Lenders) perfected Liens therein pursuant to applicable Law. Debtor shall not own any other assets or property (whether real, personal, tangible or intangible) other than as described in the Collateral Documents or disclosed in writing to Administrative Agent or Lenders and Debtor does not lease any real or personal property except as has been disclosed in writing to Administrative Agent.

**4.13     ERISA**.   Except as set forth on Schedule 4.13, neither Debtor nor any ERISA Affiliate currently maintains or has any liability (including contingent liability) with respect to, or at any time within the last six years has maintained or has had any liability (including contingent liability) with respect to, any Pension Plan.

**4.14     Labor Matters**.   Except as set forth on Schedule 4.14, to the knowledge of Debtor, there are no disputes, claims or actions pending between Debtor and any of its employees which could have a Material Adverse Effect.

**4.15     Licenses, Permits, etc**.   Debtor has the legal right to use such valid Intellectual Property rights, franchises, certificates of convenience and necessity, operating rights, licenses, permits, consents, authorizations, exemptions and orders of tribunals or otherwise as are necessary or appropriate to carry on its business as now being or currently proposed to be conducted except where the failure to have such right could not reasonably be expected to have a Material Adverse Effect or except as set forth on Schedule 4.15.

**4.16     Representations and Warranties**.   Each Notice of Borrowing shall constitute, without the necessity of specifically containing a written statement, a representation and warranty by Debtor, that no Default or Event of Default exists and that all representations and warranties contained in this Section 4 or in any other Loan Document are true and correct in all material respects on and as of the date the requested Loan is to be made.

**SECTION 5.**
**AFFIRMATIVE COVENANTS**

Debtor covenants and agrees that, so long as any of the Commitments hereunder shall remain in effect and until payment in full of all of the Loans and other Obligations, unless Required Lenders shall otherwise give prior written consent, Debtor shall perform all covenants in this Section 5.

Lehigh Coal - BET Associates DIP Credit Agreement - DP Draft 7-17-09 (2) (2)

**5.1** **Financial Statements and Other Reports**. Debtor will maintain a system of accounting established and administered in accordance with sound business practices to permit preparation of financial statements in conformity with GAAP, consistently applied, and in the manner in which they have been historically prepared. Debtor will deliver to Administrative Agent and each Lender:

(a)  as soon as available, but in any event not later than forty-five (45) days after the end of each of the first three quarterly periods of each fiscal year of Debtor, as at the end of such quarter and the related unaudited consolidated statements of income and of cash flows for such quarter and the portion of the fiscal year through the end of such quarter, setting forth in each case in comparative form the figures for the previous year, certified by a Responsible Officer as being fairly stated in all material respects (subject to normal year-end audit adjustments);

(b)  as soon as available and in any event within thirty (30) days after the close of each of the monthly accounting periods (other than a monthly accounting period ending on the same date as a fiscal quarter) in each fiscal year of Debtor, the unaudited balance sheets of Debtor as at the end of such monthly period and the related unaudited consolidated statements of operations and of cash flows for such monthly period and the portion of the fiscal year through the end of such monthly period, setting forth in each case in comparative form the figures for the related periods in the prior fiscal year, certified by a Responsible Officer as being fairly stated in all material respects (subject to normal year-end audit adjustments);

(c)  such other information concerning the business, properties, or financial condition of Debtor as Administrative Agent or Lenders shall reasonably request including copies of all reports made to the Bankruptcy Court, all reports of revenue and expenses, and all other reports or financial data given by Debtor to any other party, audit reports, registration statements or other reports or notices provided to shareholders of Debtor.

**5.2** **Budget**.

(a)  Debtor has prepared and delivered to Administrative Agent the Budget for the term of this Agreement.  The Budget sets forth for the periods covered thereby:  (i) the projected weekly operating and other cash receipts for each week commencing with the week ending August 2, 2009, (ii) the projected weekly operating and other cash disbursements for each week commencing with the week ending August 2, 2009, (iii) the projected aggregate principal amount of outstanding Loans and for each week commencing with the week ending August 2, 2009, and (iv) the projected weekly amounts of Loans required by Debtor for each week commencing with the week ending August 2, 2009 (collectively, the "Projected Information"). The Budget shall not be amended or modified without the prior approval of Administrative Agent and Required Lenders.

(b)  By no later than 8:00 a.m. (Philadelphia, PA time) on the 18th day of each month commencing on August 18, 2009, Debtor shall prepare and deliver to Administrative Agent a reconciliation of the Budget for the preceding month setting forth for the immediately preceding month a detailed comparison of the actual cash receipts, cash disbursements, Loan

Lehigh Coal - BET Associates DIP Credit Agreement - DP Draft 7-17-09 (2) (2)

balance and Loan availability to the Projected Information for such weekly periods in such month set forth in the Budget on a cumulative, weekly roll-forward basis, together with a certification from the chief financial officer of Debtor that no Material Budget Deviation has occurred.

(c)     Debtor acknowledges, confirms and agrees that commencing with the trailing two (2) month period ending on September 30, 2009, and for the trailing two (2) month period ending on the last day of each month thereafter:  (1) the actual aggregate monthly cash receipts during such period for all line items in the Budget shall not be less than ninety (90%) percent of the projected aggregate monthly cash receipts during such period for all such line items in the Budget, (2) the actual aggregate monthly cash disbursements for "employee related expenses", "inventory related expenses", "overhead related expenses" (as each such terms are defined in the Budget) and all other expenses (taken as a whole) during such period shall not be greater than one hundred ten (110%) percent of the projected aggregate monthly cash disbursements for each such category of expenses set forth in the Budget during such period, and (3) the actual aggregate monthly cash disbursements for all line items in the Budget during such period shall not be greater than one hundred ten (110%) percent of the projected aggregate monthly cash disbursements for all such line items set forth in the Budget during such period.

(d)     Debtor hereby confirms, acknowledges and agrees that (i) a failure to maintain the minimum or maximum, as applicable, deviations in the Budget as set forth in Section 5.2(c) hereof on a monthly basis shall constitute a material deviation from the Budget and an additional Event of Default (each, a "Material Budget Deviation") and (ii) the failure to deliver the Budget or any reconciliation or other reports with respect to the Budget, in form and substance reasonably satisfactory to Administrative Agent, as provided in Section 5.2(a) hereof shall constitute an Event of Default.  Administrative Agent and Lenders are relying upon the Debtor's delivery of, and compliance with, the Budget in accordance with this Section 5.2 in determining to enter into the post-petition financing arrangements provided for herein.

**5.3**     <u>**Corporate Existence**</u>.  Debtor will at all times preserve and keep in full force and effect its corporate existence and all rights and franchises material to the business of Debtor (on a consolidated basis).

**5.4**     <u>**Maintenance of Properties; Insurance**</u>.  Debtor will maintain or cause to be maintained in good repair, working order, and condition, ordinary wear and tear excepted, all material properties used or useful in its business and from time to time will make or cause to be made all appropriate repairs, renewals, and replacements thereof to the extent provided for in the Budget.  Debtor will maintain or cause to be maintained, with financially sound and reputable insurers, insurance with respect to its properties and business against loss or damage of the kinds customarily carried or maintained under similar circumstances by corporations of established reputation engaged in similar businesses to the extent provided for in the Budget.  Each such policy of casualty insurance covering damage to or loss of property shall name Administrative Agent for the benefit of Lenders as the loss payee thereunder for all losses, subject to application of proceeds as required by <u>Section 2.5</u>, and shall provide for at least thirty (30) days' prior written notice to Administrative Agent of any modification or cancellation of such policy.

Lehigh Coal - BET Associates DIP Credit Agreement - DP Draft 7-17-09 (2) (2)

**5.5    Inspection**.  Debtor shall permit Administrative Agent (through any of its respective officers, employees, or agents) from time to time, with reasonable prior written notice to Debtor and during normal business hours, to inspect and reproduce (at Debtor's expense) Debtor's books and records and to check, test, investigate (including, without limitation, the performance of environmental, geological, geotechnical, or other invasive sampling and analysis), and appraise (at Debtor's expense) the Collateral, in order to verify Debtor's financial condition or the amount, quality, value, condition of, or any other matter relating to the Collateral.  Books and records to be made available for inspection and reproduction under this <u>Section 5.4</u> shall include, without limitation, all plans, drawings, memoranda, permits, correspondence, and other documents relating to surface and underground mining, mime land reclamation, water treatment, and the establishment of bonding, trust funds, or other financial assurance mechanisms associated with these activities.  As part of these audits and inspections, Debtor shall permit Administrative Agent (through any of its respective officers, employees, or agents), with prior notice to Debtor, to consult with applicable governmental authorities regarding the status of and methods for compliance with Environmental Laws or other Laws with respect to the Collateral and/or Debtor's activities associated therewith and disclose the results of any of the diligence materials arising out of or relating to the foregoing.

**5.6    Compliance with Laws, etc**.  Debtor shall use best efforts, to materially comply with the requirements of all applicable Laws, rules, regulations, and orders (including, without limitation, the Orders) of any governmental authority.

**5.7    Environmental Disclosure and Inspection**.  Debtor shall use best efforts to exercise all due diligence in order to comply and cause (a) any tenants, under any leases or occupancy agreements affecting any portion of their Real Property and (b) all other Persons on or occupying such property, to comply with all material Environmental Laws.

**5.8    Debtor's Remedial Action Regarding Hazardous Materials**.  Debtor shall promptly take any and all necessary remedial action in connection with the presence, storage, use, disposal, transportation, or Release of any Hazardous Materials on or under, or the performance of surface or underground mining activities at, any Real Property owned, leased, licensed or otherwise used or occupied by Debtor in order to reasonably prevent or mitigate damage to the property or to Persons of third parties and to comply with all applicable material Environmental Laws (including, without limitation, the performance of mining activities, mine land reclamation, water treatment, and the establishment of related financial assurance mechanisms as required by Environmental Laws) unless the failure to so comply could not reasonably be expected to have a Material Adverse Effect.  In the event Debtor undertakes any remedial action with respect to any Hazardous Materials or the performance of surface or underground mining activities on, under or at any real property, Debtor shall conduct and complete such remedial action in compliance with all applicable material Environmental Laws, and in accordance with all material policies, orders, and directives of all federal, state, and local governmental authorities.

**5.9    Payment of Obligations**.  Debtor will pay the Obligations in accordance with the terms and provisions of the Loan Documents.

**5.10**  **Further Assurances**.  At any time or from time to time upon the request of Administrative Agent, Debtor will, at its expense, promptly execute, acknowledge, and deliver such further documents and do such other acts and things as Administrative Agent may reasonably request in order to effect fully the purposes of the Loan Documents and to provide for payment of the Obligations in accordance with the terms of this Agreement and the other Loan Documents.  In furtherance and not in limitation of the foregoing, Debtor shall take such actions as Administrative Agent may reasonably request from time to time (including, without limitation, the execution and delivery of guaranties, security agreements, pledge agreements, mortgages, deeds of trust, landlord waivers, stock powers, financing statements, and other documents, the filing or recording of any of the foregoing, title insurance with respect to any of the foregoing that relates to an interest in real property, and the delivery of stock certificates and other collateral with respect to which perfection is obtained by possession) to ensure that the Obligations are secured in accordance with the Collateral Documents and this Agreement.

**5.11**  **Use of Proceeds**.  Debtor shall use the proceeds of the Loans in accordance with in Section 2.5.

**5.12**  **Bankruptcy Information**.  Promptly after the same is available, Debtor shall furnish to counsel for Administrative Agent and counsel for Lenders (to the addresses set forth on the signature pages hereto or such other address as to which Debtor has received notice under Section 9.8) all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of Debtor with the Bankruptcy Court or the United States Trustee in the Case, or distributed by or on behalf of Debtor to any official committee appointed in the Case.

## SECTION 6.
## NEGATIVE COVENANTS

Debtor covenants and agrees that, so long as any of the Commitments hereunder shall remain in effect and until payment in full of all of the Loans and other Obligations, unless Required Lenders shall otherwise give prior written consent, Debtor shall perform all covenants in this Section 6.

**6.1**  **Indebtedness**.  Debtor shall not apply to the Bankruptcy Court for authority to, directly or indirectly, create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to, any Indebtedness, except:

       (a)    Indebtedness of Debtor pursuant to any Loan Document;

       (b)    Indebtedness of Debtor existing on the Closing Date set forth on Schedule 6.1(b) or any refinancing thereof to which Administrative Agent consents, which consent shall not be unreasonably withheld.

**6.2**  **Liens and Related Matters**.  Debtor shall not, directly or indirectly, create, incur, assume or permit to exist any Liens on or with respect to any of its property of any kind, whether now owned or hereafter acquired, except:

Lehigh Coal - BET Associates DIP Credit Agreement - DP Draft 7-17-09 (2) (2)

(a)     Liens granted under the Collateral Documents to Administrative Agent, for the benefit of Lenders, on all assets of Debtor; and

(b)     Liens described on <u>Schedule 4</u> of this Agreement, or any Liens granted in connection with the refinancing of any Indebtedness secured thereby.

**6.3     <u>Fundamental Changes</u>.**  Debtor shall not, directly or indirectly, enter into any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or dispose of all or substantially all of its property or business.

**6.4     <u>Disposition of Assets</u>.**  Debtor shall not, directly or indirectly, dispose of any of its property, business or assets, whether now owned or hereafter acquired, except for Inventory in the ordinary course of its business, subject to the covenants set forth herein.

**6.5     <u>Restricted Payments</u>.**  Debtor shall not declare or pay any dividend on, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of, any capital stock of Debtor, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of Debtor.

**6.6     <u>Transactions with Affiliates</u>.**  Debtor shall not, directly or indirectly, enter into or permit to exist any transaction (including, without limitation, the purchase, sale, lease, or exchange of any property or the rendering of any service) with any Affiliate of Debtor, on terms that are less favorable to Debtor than those that might be obtained at the time from Persons who are not an Affiliate, except for existing transactions described on Schedule 6.6.

**6.7     <u>Changes in Fiscal Periods</u>.**  Debtor shall not change its method of determining Fiscal Years or Fiscal Quarters.

**6.8     <u>Negative Pledge Clauses</u>.**  Debtor shall not enter into or suffer to exist or become effective any agreement that prohibits or limits the ability of Debtor to create, incur, assume or suffer to exist any Lien for the exclusive benefit of Administrative Agent for the benefit of Lenders upon any of its property or revenues, whether now owned or hereafter acquired, other than (a) this Agreement and the other Loan Documents, (b) any agreements governing any purchase money Liens or Capital Lease Obligations otherwise permitted hereby (in which case, any prohibition or limitation shall only be effective against the assets financed thereby), (c) an agreement relating to specific property encumbered to secure payment of particular Indebtedness or to be sold pursuant to an executed agreement with respect to a disposition permitted by <u>Section 6.4</u>, (d) customary restrictions contained in leases, subleases, licenses and sublicenses permitted hereunder, and (e) the agreements and documents referred to in Section 4.3.

**6.9     <u>Lines of Business</u>.**  Debtor shall not enter into any business, except for those businesses in which such Persons are engaged on the date of this Agreement and pursuant to the Budget, Debtor shall not, and shall not apply to the Bankruptcy Court for authority to, make any non-ordinary course payments, provided, however, that Debtor may pursue the creation of an electrical generating facility at its site, subject to all appropriate restrictions set forth in this Agreement.

Lehigh Coal - BET Associates DIP Credit Agreement - DP Draft 7-17-09 (2) (2)

**6.10** __Material Contracts__.  Debtor shall not enter into Material Contract without the prior, written consent of Administrative Agent.  For the purposes hereof, a "__Material Contract__" shall mean and include any contractual arrangement providing for the sale or other disposition Inventory or Equipment or other Goods having a value in excess of $250,000 (irrespective of whether or not in the ordinary course of business), requiring the furnishing of Goods at a fixed price or under a supply or requirements arrangement having a term extending beyond the Termination Date, or otherwise providing for a sale or other disposition of assets in a manner in which is inconsistent with the core business of Debtor.

**6.11** __Chapter 11 Claims__.  Except for the Carve-Outs or as otherwise provided in the Collateral Documents, Debtor shall not nor shall Debtor apply to the Bankruptcy Court for authority to, incur, create, assume, suffer to exist or permit any other super-priority claim or Lien which is *pari passu* with or senior to the claims of Administrative Agent and Lenders granted pursuant to the Loan Documents.

**6.12** __Pre-Petition Payments__.  Without the prior written consent of Administrative Agent, as directed by Lenders, Debtor shall not, and shall not apply to the Bankruptcy Court for authority to: (a) make any payment with respect to pre-petition obligations of Debtor (other than as expressly permitted by this Agreement), (b) amend, modify or change any agreement or document relating to any pre-petition Indebtedness, or (c) make any payment on any post-petition Indebtedness outside of such Debtor's ordinary course of business.

## SECTION 7.
## EVENTS OF DEFAULT

If any of the following conditions or events ("__Events of Default__") shall occur:

**7.1** __Failure to Make Payments When Due__.

    (a)    Failure by Debtor to pay any installment of principal of, or interest on, any Loan or any fees or other amounts payable under the Loan Documents or any other obligation when due, whether at stated maturity, by acceleration, by notice of voluntary prepayment, by mandatory prepayment or otherwise;

    (b)    Failure by Debtor to pay any undisputed, post-petition Taxes or Indebtedness, when due, including real estate Taxes to the extent that the payment of such Taxes is permitted under the Bankruptcy Code or by the Bankruptcy Court.

**7.2** __Breach of Certain Covenants__.  Failure of Debtor to perform or comply with any term or condition contained in Section 5.2, Section 5.3, Section 6 or Section 11.2(d) or (e) of this Agreement.

**7.3** __Breach of Warranty__.  Any representation, warranty, certification or other statement made by Debtor or Guarantor in any Loan Document or in any statement or certificate at any time given by Debtor or Guarantor in writing pursuant hereto or thereto or in connection herewith or therewith shall be false in any material respect on the date as of which made.

Lehigh Coal - BET Associates DIP Credit Agreement - DP Draft 7-17-09 (2) (2)

**7.4** **Other Defaults Under Loan Documents**.  Debtor or Guarantor shall default in the performance of or compliance with any term contained in this Agreement or any of the other Loan Documents, other than any such term referred to in any other section of this <u>Section 7</u>, provided if such failure shall remain unremedied for ten (10) days after the date of written notice thereof shall have been furnished to Debtor, provided further that such failure is capable of cure.

**7.5** **Dissolution**.  Any order, judgment or decree shall be entered against Debtor decreeing the dissolution of Debtor.

**7.6** **Invalidity of Guaranty; Failure of Security; Repudiation of Obligations**.  At any time after the execution and delivery thereof, (a) the Surety Agreement for any reason, other than the satisfaction in full of all Obligations, shall cease to be in full force and effect against Guarantor or shall be declared to be null and void; (b) any Collateral Document shall cease to be in full force and effect or shall be declared null and void, or Administrative Agent for the benefit of Lenders shall not have or shall cease to have a valid and perfected first priority Lien in any collateral purported to be covered thereby, in each case for any reason other than the failure of Administrative Agent or any Lender to take any action within its control; or (c) Debtor or Guarantor shall contest the validity or enforceability of any Loan Document in writing or deny in writing that it has any further liability, including with respect to future advances by Lenders, under any Loan Document to which it is a party.

**7.7** **Bankruptcy Matters**.

(a) **Dismissal**.  (i) The Case shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, (ii) a trustee under Chapter 11 of the Bankruptcy Code shall be appointed in the Case, or (iii) an examiner having enlarged powers relating to the operation of the business of Debtor or any Guarantor (beyond those set forth under Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed.

(b) **Interim Order or Final Order Stayed**.  (i) An order of a court of competent jurisdiction shall be entered staying or rescinding the Interim Order or the Final Order; or (ii) an order of a court of competent jurisdiction shall be entered amending, supplementing or otherwise modifying the Interim Order without the written consent of Lenders, or the Final Order without the written consent of Lenders.

(c) **Disclosure Statement**.  The filing or support of any plan of reorganization or liquidation, disclosure statement, or any direct or indirect amendment to such plan or disclosure statement, by Debtor, or any other Person that does not provide for (i) the payment in full and in cash of the Obligations, or to which Lenders do not consent or otherwise agree to the treatment of their claims, or (ii) the entry of any order terminating Debtor's exclusive rights to file a plan of reorganization or liquidation; provided that, the expiration of such exclusivity rights without court order shall not be deemed an Event of Default.

(d) **Reorganization Plan**.  The entry of an order in the Case confirming a Bankruptcy Plan that does not contain a provision for termination of the Commitments and

Lehigh Coal - BET Associates DIP Credit Agreement - DP Draft 7-17-09 (2) (2)

indefeasible repayment in full in cash of all of the Obligations under the Loan Documents on or before the effective date of such Bankruptcy Plan, or which is not approved by Lenders.

(e) **Challenge of Certain Claims**. Any attempt by Debtor to obtain, or if any other party in interest obtains, an order of the Bankruptcy Court or other judgment, and the effect of such order or judgment is to, invalidate, reduce or otherwise impair Administrative Agent's or any Lenders' claims, or to subject Administrative Agent's or any Lenders' collateral to any surcharge pursuant to Sections 506(c), 552(b), or 105(a) of the Bankruptcy Code.

(f) **Substitution of Collateral**. Debtor shall apply for an order substituting any assets for all or any portion of the Collateral, except as provided in the instruments evidencing and governing the DIP Facility.

(g) **Unpermitted Payment**. Debtor shall make any payments of pre-petition Indebtedness other than (i) as permitted under the Interim Order and/or the Final Order (as applicable), (ii) as permitted by any of the orders entered by the Bankruptcy Court on or about the date of entry of an Order approving the DIP Facility and in the approximate amounts reflected on the Budget, (iii) as otherwise permitted in this Agreement, or (iv) in connection with the, assumption of any contract or lease approved by the Bankruptcy Court and consented to by Lenders, or Debtor shall pay, or agree to pay, any breakup, termination or similar fee, unless otherwise consented to by Lenders.

(h) **Relief from Stay**. An order shall be entered granting relief from the automatic stay permitting foreclosure of any assets of Debtor unless such relief is sought by Administrative Agent or any Lender, except for orders resulting from relief from stay motions pending as of the date of this Agreement.

(i) **Delay**. The entry of the Final Order shall not have occurred within thirty (30) days after the date of entry of an Order approving the DIP Facility.

(j) **Certain Motions**. Except for the Carve-Outs, Debtor shall file any pleading seeking, or otherwise consenting to, (i) the invalidation, subordination or otherwise challenging the Liens and super-priority claim status granted to secure the Obligations hereunder or (ii) an order shall be entered by the Bankruptcy Court invalidating or subordinating the Liens or the super-priority claim status of the Obligations hereunder.

(k) **Final Determination**. The Bankruptcy Court or any other court having jurisdiction over Debtor makes a final determination with respect to any motion or proceeding brought by any Person which results in the material impairment of the rights of Administrative Agent or Lenders under any of the Loan Documents.

**7.8** **Change of Management.** Guarantor shall cease to serve as President of Debtor, provided, however, that the death or incapacity of Guarantor or inability of Guarantor to serve shall not be deemed an Event of Default. In the event of Guarantor's death, incapacity or inability to serve, then Debtor's Board of Directors shall replace Guarantor with the consent of the Required Lenders, which consent shall not be unreasonably withheld.

**7.9** **Labor Dispute**. Any Material Adverse Effect occurs with respect to the revenues of Debtor as a result of any strike, lockout or labor dispute.

THEN upon the occurrence and during the continuation of any Event of Default, and without further order of or application to the Bankruptcy Court, Administrative Agent shall, upon the written request or with the written consent of Required Lenders, by written notice to Debtor, (i) declare all or any portion of the principal of, interest on, and other amounts payable on the Loans, and all or any portion of the other Obligations to be, and the same shall forthwith become, immediately due and payable; (ii) terminate the Commitments and the obligation of each Lender to make any Loan; (iii) enforce all of the Liens and security interests created pursuant to this Agreement, the Collateral Documents and/or the Orders; (iv) apply any cash collateral held by Administrative Agent to the repayment of the Obligations; (v) setoff amounts in bank accounts maintained with Administrative Agent or any Lender, or otherwise enforce rights against any other Collateral in the possession of Administrative Agent for the benefit of Lenders; and/or (vi) take any other action or exercise any other right or remedy of Administrative Agent or Lenders under any of the Loan Documents, the Orders or applicable Law including reliance on the deeds in lieu of foreclosure and answer in mortgage foreclosure held by Administrative Agent.

## SECTION 8.
## ADMINISTRATIVE AGENT

**8.1** **Appointment**.

(a) **Appointment of Administrative Agent**. Each Lender hereby appoints Administrative Agent as its nominee and agent, in its name and on its behalf: (i) to act as nominee for and on behalf of such Lender in and under all Loan Documents; (ii) to arrange the means whereby the funds of Lenders are to be made available to Debtor under the Loan Documents; (iii) to take such action as may be requested by any Lender under the Loan Documents (when such Lender is entitled to make such request under the Loan Documents and after such requesting Lender has obtained the concurrence of such other Lenders as may be required under the Loan Documents); (iv) to receive all documents and items to be furnished to Lenders under the Loan Documents, except where the Loan Documents require documents to be delivered directly to Lenders; (v) to timely distribute, and Administrative Agent agrees to so distribute, to each Lender all material information, requests, documents, and items received from Debtor under the Loan Documents, if any; (vi) to promptly distribute to each Lender its ratable part of each payment or prepayment (whether voluntary, as proceeds of Collateral upon or after foreclosure, as proceeds of insurance thereon, or otherwise) in accordance with the terms of the Loan Documents; and (vii) to deliver to the appropriate Persons requests, demands, approvals, and consents received from Lenders; provided, however, Administrative Agent shall not be required to take any action which exposes Administrative Agent to personal liability or which is contrary to the Loan Documents or applicable Law.

(b) **Appointment of Collateral Agent**. Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of Lenders hereby irrevocably appoints and authorizes Administrative Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by Debtor or Guarantor

Lehigh Coal - BET Associates DIP Credit Agreement - DP Draft 7-17-09 (2) (2)

to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto. In this connection, Administrative Agent, as "collateral agent" and any co-agents, sub-agents and attorneys-in fact appointed by Administrative Agent pursuant to <u>Section 8.4</u> for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of Administrative Agent, shall be entitled to the benefits of all provisions of this <u>Section 8</u> and other applicable provisions of this Agreement.

(c)     **Resignation of Administrative Agent**. Administrative Agent may resign at any time with or without cause as Administrative Agent under the Loan Documents by giving written notice thereof to Lenders. Should the initial or any successor Administrative Agent ever cease to be a party hereto or should the initial or any successor Administrative Agent ever resign as Administrative Agent, then Required Lenders shall elect the successor Administrative Agent in their sole discretion. Upon the acceptance of any appointment as Administrative Agent under the Loan Documents by a successor Administrative Agent, such successor Administrative Agent shall thereupon succeed to and become vested with all the rights of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations of Administrative Agent under the Loan Documents, and each Lender shall execute such documents as any Lender may reasonably request to reflect such change in and under the Loan Documents. After any retiring Administrative Agent's resignation as Administrative Agent under the Loan Documents, the provisions of this <u>Section 8</u> shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent under the Loan Documents.

(d)     **Administrative Agent as a Lender; Non-Fiduciary**. Each Lender and Debtor agree that Administrative Agent is not a fiduciary for Lenders or for Debtor but simply is acting in the capacity described herein to alleviate administrative burdens for both Debtor and Lenders, that Administrative Agent has no duties or responsibilities to Lenders or Debtor except those expressly set forth herein. Other than as set forth in <u>Section 9.6</u>, Administrative Agent shall comply with, or be permitted to rely on, instructions of Required Lenders.

(e)     **Other Activities of Administrative Agent**. Administrative Agent and its Affiliates may now or hereafter be engaged in one or more loan, letter of credit, leasing, or other financing transactions with Debtor, act as trustee or depositary for Debtor, or otherwise be engaged in other transactions with Debtor (collectively, the "**other activities**") not the subject of the Loan Documents. Without limiting the rights of Lenders specifically set forth in the Loan Documents, Administrative Agent and its Affiliates shall not be responsible to account to Lenders for such other activities, and no Lender shall have any interest in any other activities, any present or future guaranties by or for the account of Debtor which are not contemplated or included in the Loan Documents, any present or future offset exercised by Administrative Agent and its Affiliates in respect of such other activities, any present or future property taken as security for any such other activities, or any property now or hereafter in the possession or control of Administrative Agent or its Affiliates which may be or become security for the obligations of Debtor or Guarantor arising under the Loan Documents by reason of the general description of indebtedness secured or of property contained in any other agreements, documents, or instruments related to any such other activities; <u>provided</u> that, if any payments in

Case 5:08-bk-51957-JJT    Doc 639-1    Filed 07/21/09    Entered 07/21/09 17:59:51
Desc Exhibit A    Page 45 of 71

respect of such guaranties or such property or the proceeds thereof shall be applied to reduction of the Obligations, then each Lender shall be entitled to share in such application ratably.

8.2 **Expenses**. Upon demand by Administrative Agent, each Lender shall pay its ratable portion (determined as of the date reimbursement is sought hereunder) of any reasonable expenses (including, without limitation, court costs, reasonable attorneys' fees, and other costs of collection) incurred by Administrative Agent in connection with any of the Loan Documents if and to the extent such Administrative Agent does not receive reimbursement therefor from other sources within sixty (60) days after incurred; provided that, each Lender shall be entitled to receive its ratable portion of any reimbursement for such expenses, or part thereof, which Administrative Agent subsequently receives from such other sources.

8.3 **Proportionate Absorption of Losses**. Except as otherwise provided in the Loan Documents, nothing in the Loan Documents shall be deemed to give any Lender any advantage over any other Lender insofar as the Obligation is concerned, or to relieve any Lender from absorbing its ratable portion of any losses sustained with respect to the Obligations (except to the extent such losses result from unilateral actions or inactions of any Lender that is not made in accordance with the terms and provisions of the Loan Documents).

8.4 **Delegation of Duties; Reliance**. Administrative Agent may perform any of its duties or exercise any of its rights under the Loan Documents by or through its agents or representatives. Administrative Agent shall (a) be entitled to rely upon (and shall be protected in relying upon) any writing, resolution, notice, consent, certificate, affidavit, letter, cablegram, telecopy, telegram, telex or teletype message, statement, order, or other documents or conversation believed by it or them to be genuine and correct and to have been signed or made by the proper Person and, with respect to legal matters, upon opinion of counsel selected by Administrative Agent, (b) be entitled to deem and treat each Lender as the owner and Lender of the Obligations owed to such Lender for all purposes until, subject to Section 9.1, written notice of the assignment or transfer thereof shall have been given to and received by Administrative Agent (and any request, authorization, consent, or approval of any Lender shall be conclusive and binding on each subsequent Lender, assignee, or transferee of the Obligation owed to such Lender or portion thereof until such notice is given and received), (c) not be deemed to have notice of the occurrence of a Default or Event of Default unless a responsible officer of Administrative Agent, who handles matters associated with the Loan Documents and transactions thereunder, has received written notice from a Lender or Debtor and stating that such notice is a *"Notice of Default;"* and (d) be entitled to consult with legal counsel (including counsel for Debtor), independent accountants, and other experts selected by Administrative Agent and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts.

8.5 **Limitation of Liability**.

(a) **General**. Neither Administrative Agent nor any of its agents, representatives, employees, or officers shall be liable for any action taken or omitted to be taken by it or them under the Loan Documents in good faith and reasonably believed by it or them to be within the discretion or power conferred upon it or them by the Loan Documents or be

responsible for the consequences of any error of judgment, except for fraud, gross negligence, or willful misconduct; and Administrative Agent has no fiduciary relationship with any Lender by virtue of the Loan Documents (provided that, nothing herein shall negate the obligation of Administrative Agent to account for funds received by it for the account of any Lender).

(b)     **Non-Discretionary Actions, Indemnification**.  Unless indemnified to its satisfaction against loss, cost, liability, and expense, Administrative Agent shall not be compelled to do any act under the Loan Documents or to take any action toward the execution or enforcement of the powers thereby created or to prosecute or defend any suit in respect of the Loan Documents.  If Administrative Agent requests instructions from Lenders or Required Lenders, as the case may be, with respect to any act or action (including, but not limited to, any failure to act) in connection with any Loan Document, Administrative Agent shall be entitled (but shall not be required) to refrain (without incurring any liability to any Person by so refraining) from such act or action unless and until it has received such instructions.  Except where action of Required Lenders or all Lenders is required in the Loan Documents, Administrative Agent may act hereunder in its own discretion without requesting instructions.  In no event, however, shall Administrative Agent be required to take any action which it or they determine could incur for it or them criminal or onerous civil liability.  Without limiting the generality of the foregoing, no Lender shall have any right of action against Administrative Agent as a result of Administrative Agent's acting or refraining from acting hereunder in accordance with the instructions of Required Lenders (or all Lenders if required in the Loan Documents).

(c)     **Independent Credit Decision**.  Administrative Agent shall not be responsible in any manner to any Lender or any Participant for, and each Lender represents and warrants that it has not relied upon Administrative Agent in respect of, (a) the creditworthiness of Debtor or Guarantor and the risks involved to such Lender, (b) the effectiveness, enforceability, genuineness, validity, or the due execution of any Loan Document, (c) any representation, warranty, document, certificate, report, or statement made therein or furnished thereunder or in connection therewith, (d) the existence, priority, or perfection of any Lien hereafter granted or purported to be granted under any Loan Document, or (e) observation of or compliance with any of the terms, covenants, or conditions of any Loan Document on the part of Debtor.  Each Lender agrees to indemnify Administrative Agent and hold it harmless from and against (but limited to such Lender's Pro Rata Share of) any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, reasonable expenses, and reasonable disbursements of any kind or nature whatsoever which may be imposed on, asserted against, or incurred by them in any way relating to or arising out of the Loan Documents or any action taken or omitted by Administrative Agent under the Loan Documents (including any of the foregoing arising from the negligence of Administrative Agent), to the extent Administrative Agent is not reimbursed for such amounts by Debtor or Guarantor (provided that, Administrative Agent shall not have the right to be indemnified hereunder for its or their own fraud, gross negligence, or willful misconduct).

**8.6**     **Default; Collateral**.

(a)     Upon the occurrence and continuance of a Default or an Event of Default, Lenders agree to promptly confer in order that Required Lenders or Lenders, as the case may be, may agree upon a course of action for the enforcement of the rights of Lenders; and Administrative Agent shall be entitled to refrain from taking any action (without incurring any liability to any Person for so refraining) unless and until Administrative Agent shall have received instructions from Required Lenders or Lenders, as the case may be.  All rights of action under the Loan Documents and all rights to the Collateral, if any, hereunder may be enforced by Administrative Agent at the direction of Required Lenders and any suit or proceeding instituted by Administrative Agent at the direction of Required Lenders in furtherance of such enforcement shall be brought in its name as Administrative Agent without the necessity of joining as plaintiffs or defendants any Lender, and the recovery of any judgment shall be for the benefit of Lenders subject to the expenses of Administrative Agent.  In actions with respect to any property of Debtor or Guarantor, Administrative Agent is acting for the ratable benefit of each Lender.  Any and all agreements to subordinate (whether made heretofore or hereafter) other indebtedness or obligations of Debtor or Guarantor to the Obligations shall be construed as being for the ratable benefit of each Lender.

(b)     Each Lender authorizes and directs Administrative Agent to enter into the Collateral Documents for the benefit of Lenders.  Except to the extent unanimity is required hereunder, each Lender agrees that any action taken by Required Lenders in accordance with the provisions of the Loan Documents, and the exercise by Administrative Agent of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all Lenders.

(c)     Administrative Agent is hereby authorized on behalf of all of Lenders, without the necessity of any notice to or further consent from any Lender, from time to time to take any action with respect to any Collateral or Collateral Documents which may be necessary to perfect and maintain perfected the Liens upon the Collateral granted pursuant to the Collateral Documents.

(d)     Administrative Agent shall have no obligation whatsoever to any Lender or to any other Person to assure that the Collateral exists or is owned by Debtor or is cared for, protected, or insured or has been encumbered or that the Liens granted to Administrative Agent for the benefit of Lenders herein or pursuant hereto have been properly or sufficiently or lawfully created, perfected, protected, or enforced, or are entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure, or fidelity, or to continue exercising, any of the rights granted or available to Administrative Agent in this Section 8.6(d) or in any of the Collateral Documents.

(e)     Lenders hereby irrevocably authorize Administrative Agent, at its option and in its discretion, to release any Lien granted to or held by Administrative Agent upon any Collateral:

(i)     upon termination of the Commitments and payment and satisfaction of the Obligations;

(ii)    constituting property in which Debtor did not own an interest at the time the Lien was granted or at any time thereafter;

(iii)   upon the sale, transfer, or disposition of Collateral which is expressly permitted pursuant to the Loan Documents; or

(iv)    if approved, authorized, or ratified in writing by all necessary Lenders.  Upon request by Administrative Agent at any time, Lenders will confirm in writing Administrative Agent's authority to release particular types or items of Collateral pursuant to this <u>Section 8.6</u>.

(f)     In furtherance of the authorizations set forth in this <u>Section 8.6</u>, each Lender hereby irrevocably appoints Administrative Agent its attorney-in-fact, with full power of substitution, for and on behalf of and in the name of each such Lender, as applicable, (i) to enter into Collateral Documents (including, without limitation, any appointments of substitute trustees under any Collateral Document), (ii) to take action with respect to the Collateral and Collateral Documents to perfect, maintain, and preserve Lenders' Liens, and (iii) to execute instruments of release or to take other action necessary to release Liens upon any Collateral to the extent authorized in, <u>paragraph (e)</u> hereof.  This power of attorney shall be liberally, not restrictively, construed so as to give the greatest latitude to Administrative Agent's power, as attorney, relative to the Collateral matters described in this <u>Section 8.6</u>.  The powers and authorities herein conferred on Administrative Agent may be exercised by Administrative Agent through any Person who, at the time of the execution of a particular instrument, is an officer of Administrative Agent.  The power of attorney conferred by this <u>Section 8.6(f)</u> is granted for valuable consideration and is coupled with an interest and is irrevocable so long as the Obligations, or any part thereof, shall remain unpaid or Lenders are obligated to make any borrowings under the Loan Documents.

**8.7**    <u>**Limitation of Liability**</u>.  To the extent permitted by Law, (a) Administrative Agent (acting in its agent capacity) shall not incur any liability to any Lender or Participant except for acts or omissions resulting from its own fraud, gross negligence or willful misconduct, as finally determined by a court of competent jurisdiction, and (b) neither Administrative Agent nor any Lender or Participant shall incur any liability to any other Person for any act or omission of any other Lender or Participant.

**8.8**    <u>**Relationship of Lenders**</u>.    Nothing herein shall be construed as creating a partnership or joint venture among Administrative Agent and Lenders.

**8.9**    <u>**Benefits of Agreement**</u>.   None of the provisions of this <u>Section 8</u> shall inure to the benefit of Debtor or any other Person other than Lenders; consequently, Debtor shall not be entitled to rely upon, or to raise as a defense, in any manner whatsoever, the failure of Administrative Agent or any Lender to comply with such provisions.

**8.10** <u>Obligations Several</u>. The obligations of Lenders hereunder are several, and each Lender hereunder shall not be responsible for the obligations of the other Lenders hereunder, nor will the failure of one Lender to perform any of its obligations hereunder relieve the other Lenders from the performance of their respective obligations hereunder.

**SECTION 9.**
**MISCELLANEOUS**

**9.1** <u>Assignments and Participations</u>.

(a) The provisions of this Agreement, including <u>Sections 10</u> and <u>11</u>, shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that Debtor may not, except as otherwise permitted under the Loan Documents, assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to any Person approved by Administrative Agent in accordance with the provisions of <u>Section 9.1(b)</u>, (ii) by way of participation in accordance with the provisions of <u>Section 9.1(d)</u>, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of <u>Section 9.1(f)</u> (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in <u>Section 9.1(d)</u> and, to the extent expressly contemplated hereby, the Affiliates of each of Administrative Agent and Lenders) any legal or equitable right, remedy, or claim under or by reason of this Agreement.

(b) Any Lender may at any time assign to one or more Persons approved by Administrative Agent (such approval not to be unreasonably withheld or delayed) all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment); <u>provided</u> that (1) except in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment at the time owing to it or in the case of an assignment to a Lender or an Affiliate of a Lender with respect to a Lender, the aggregate amount of the Commitments of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to Administrative Agent or, if *"Trade Date"* is specified in the Assignment and Assumption, as of the Trade Date) shall not be less than $100,000, unless Administrative Agent consents; (ii) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Commitments assigned; and (iii) the parties to each assignment shall execute and deliver to Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $1,500, and the assignee, if it shall not be a Lender, shall deliver to Administrative Agent such information as Administrative Agent shall reasonably request. Subject to acceptance and recording thereof by Administrative Agent pursuant to <u>Section 9.1(c)</u>, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under

43

this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of <u>Sections 2.7</u>, <u>7</u>, and <u>9</u> with respect to facts and circumstances occurring prior to the effective date of such assignment. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with <u>Section 9.1(d)</u>.

   (c) Administrative Agent, acting solely for this purpose as an agent of Debtor, shall maintain at the Funding and Payment Office, a copy of each Assignment and Assumption delivered to it and the names and addresses of Lenders and the Loans owing to each Lender on the Register.

   (d) Any Lender may at any time, without the consent of, or notice to, Debtor or Administrative Agent, sell participations to any Person (other than a natural person or Debtor or any of Debtor' Affiliates or Subsidiaries) (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and (iii) Debtor, Administrative Agent, and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification, or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification, or waiver with respect to the following: extending the due date for payment of any amount in respect of principal (other than mandatory prepayments), interest, or fees due under the Loan Documents, reducing the interest rate or the amount of principal or fees applicable to the Obligations (except such reductions as are contemplated by the Loan Documents), or releasing all or any substantial portion of the Collateral for the Obligations under the Loan Documents that affects such Participant. Subject to <u>Section 9.1(e)</u>, Debtor agrees that each Participant shall be entitled to the benefits of <u>Section 2.7</u> to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to <u>Section 9.l(b)</u>. To the extent permitted by Law, each Participant also shall be entitled to the benefits of <u>Section 9.4</u> as though it were a Lender, <u>provided</u> such Participant agrees to be subject to <u>Section 9.5</u> as though it were a Lender.

   (e) A Participant shall not be entitled to receive any greater payment under <u>Section 2.7</u> than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with Agent's prior written consent. A Participant that is not incorporated under the Laws of the United States of America or a state thereof shall not be entitled to the benefits of <u>Section 2.7</u> unless Debtor is notified of the participation sold to such Participant and such Participant agrees, for the benefit of Debtor, to comply with <u>Section 2.7</u> as though it were a Lender.

(f)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including, without limitation, any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

**9.2     Expenses**.     Whether or not the transactions contemplated hereby shall be consummated, Debtor agrees to pay, within five (5) Business Days following Debtor's receipt of a request from Administrative Agent to make such payments, (a) all the actual and reasonable costs and expenses (including reasonable attorney's fees) of Administrative Agent and Lenders in connection with the negotiation, preparation, execution and administration of the Loan Documents and any consents, amendments, waivers or other modifications thereto; (b) all the costs of Debtor's and Guarantor's performance of and compliance with all agreements and conditions on its part to be performed or complied with under this Agreement and the other Loan Documents including with respect to confirming compliance with environmental and insurance requirements; (c) the reasonable fees, expenses and disbursements of counsel and financial advisors to Lenders and counsel and financial advisors to Administrative Agent in connection with the negotiation, preparation, execution and administration of the Loan Documents and any consents, amendments, waivers or other modifications thereto and any other documents or matters requested by Debtor; (d) all the actual costs and reasonable expenses of creating and perfecting Liens in favor of Administrative Agent on behalf of Lenders pursuant to any Collateral Document, including filing and recording fees, expenses and taxes, stamp or documentary taxes, search fees, and reasonable fees, expenses and disbursements of counsel to Administrative Agent or of counsel to Lenders; (e) all the actual costs and reasonable expenses (including the reasonable fees, expenses and disbursements of any auditors, accountants, appraisers, environmental consultants or any other consultants, advisors and agents employed or retained by Administrative Agent, Lenders and their counsel) in connection with the valuation (upon the occurrence and during the continuance of an Event of Default), custody or preservation of any of the Collateral; (f) all other actual and reasonable costs and expenses incurred by Lenders or Administrative Agent in connection with the syndication of the Commitments and the negotiation, preparation and execution of the Loan Documents and any consents, amendments, waivers or other modifications thereto and the transactions contemplated thereby; and (g) reasonable fees (including the reasonable fees, expenses and disbursements of any auditors, accountants, appraisers, environmental consultants or any other consultants, advisors and agents employed or retained by Administrative Agent, Lenders and their counsel), expenses and disbursements of counsel to Lenders and counsel to Administrative Agent in connection with the Case and all actions related to the Case.

**9.3     Indemnity**.     **DEBTOR AGREES TO INDEMNIFY AND HOLD HARMLESS ADMINISTRATIVE AGENT, EACH LENDER, AND EACH OF THEIR RESPECTIVE AFFILIATES AND THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, ATTORNEYS, AND ADVISORS (EACH, AN "INDEMNIFIED PARTY") FROM AND AGAINST ANY AND ALL CLAIMS, DAMAGES, LOSSES, LIABILITIES (INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL CLAIMS), COSTS, AND EXPENSES (INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES) THAT MAY BE INCURRED BY OR ASSERTED**

OR AWARDED AGAINST ANY INDEMNIFIED PARTY, IN EACH CASE ARISING OUT OF OR IN CONNECTION WITH OR BY REASON OF (INCLUDING, WITHOUT LIMITATION, IN CONNECTION WITH ANY INVESTIGATION, LITIGATION, OR PROCEEDING OR PREPARATION OF DEFENSE IN CONNECTION THEREWITH) THE NEGOTIATION AND CONSUMMATION OF THE DIP FACILITY, THE LOAN DOCUMENTS, ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN OR THE ACTUAL OR PROPOSED USE OF THE PROCEEDS OF THE LOANS (INCLUDING ANY OF THE FOREGOING ARISING FROM THE NEGLIGENCE OF THE INDEMNIFIED PARTY), EXCEPT TO THE EXTENT SUCH CLAIM, DAMAGE, LOSS, LIABILITY, COST, OR EXPENSE IS FOUND IN A FINAL, NONAPPEALABLE JUDGMENT BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED FROM SUCH INDEMNIFIED PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT. IN THE CASE OF AN INVESTIGATION, LITIGATION, OR OTHER PROCEEDING TO WHICH THE INDEMNITY IN THIS <u>SECTION 9.3</u> APPLIES, SUCH INDEMNITY SHALL BE EFFECTIVE WHETHER OR NOT SUCH INVESTIGATION, LITIGATION, OR PROCEEDING IS BROUGHT BY DEBTOR, ITS DIRECTORS, SHAREHOLDERS, GUARANTOR, OR CREDITORS OR AN INDEMNIFIED PARTY OR ANY OTHER PERSON OR ANY INDEMNIFIED PARTY IS OTHERWISE A PARTY THERETO. DEBTOR AGREES NOT TO ASSERT ANY CLAIM AGAINST ANY INDEMNIFIED PARTY ON ANY THEORY OF LIABILITY, FOR SPECIAL, INDIRECT, CONSEQUENTIAL, OR PUNITIVE DAMAGES ARISING OUT OF OR OTHERWISE RELATING TO THE LOAN DOCUMENTS, ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN OR THE ACTUAL OR PROPOSED USE OF THE PROCEEDS OF THE LOANS. WITHOUT PREJUDICE TO THE SURVIVAL OF ANY OTHER AGREEMENT OF DEBTOR HEREUNDER, THE AGREEMENTS AND OBLIGATIONS OF DEBTOR CONTAINED IN THIS <u>SECTION 9.3</u> SHALL SURVIVE THE PAYMENT IN FULL OF THE LOANS AND ALL OTHER AMOUNTS PAYABLE UNDER THE LOAN DOCUMENTS.

     **9.4**   <u>**Set-Off**</u>. If an Event of Default exists, each Lender shall be entitled to exercise (for the benefit of all Lenders in accordance with <u>Section 9.5</u>) the rights of offset and/or banker's Lien against each and every account and other property, or any interest therein, which Debtor may now or hereafter have with, or which is now or hereafter in the possession of, such Lender to the extent of the full amount of the Obligations.

     **9.5**   <u>**Ratable Sharing**</u>. If any Lender shall obtain any payment or prepayment with respect to the Obligations (whether voluntary, involuntary, or otherwise, including, without limitation, as a result of exercising its rights under <u>Section 9.4</u>) which is in excess of its share of any such payment in accordance with the relevant rights of Lenders under the Loan Documents, then such Lender shall purchase from the other Lenders such participations as shall be necessary to cause such purchasing Lender to share the excess payment with each other Lender in accordance with the relevant rights under the Loan Documents. If all or any portion of such excess payment is subsequently recovered from such purchasing Lender, then the purchase shall be rescinded and the purchase price restored to the extent of such recovery. Debtor agrees that any Lender purchasing a participation from another Lender pursuant to this <u>Section 9.5</u> may, to the fullest extent permitted by Law, exercise all of its rights of payment (including the right of

offset) with respect to such participation as fully as if such Lender were the direct creditor Debtor in the amount of such participation.

**9.6** **Amendments and Waivers**.  No amendment, modification, termination or waiver of any provision of this Agreement, and no consent to any departure by Debtor therefrom, shall in any event be effective without the written concurrence of Required Lenders (unless the consent of any other Person or Persons is expressly required); provided that any such amendment, modification, termination, waiver or consent which: (a) increases the amount of any of the Commitments or reduces the principal amount of any of the Loans; (b) changes in any manner the definition of "Pro Rata Share" or the definition of "Required Lenders"; (c) postpones the scheduled final maturity date; postpones the date on which any interest or any fees are payable (other than mandatory prepayments); (d) decreases the interest rate borne by any of the Loans; (e) releases any Lien granted in favor of Administrative Agent with respect to any substantial portion of the Collateral, any material Guarantor from its obligations under the Guaranty, in each case other than in accordance with the terms of the Loan Documents; or (f) changes in any manner the provisions contained in Section 7.1 or this Section 9.6 shall be effective only if evidenced by a writing signed by or on behalf of each Lender affected thereby. In addition, no amendment, modification, termination or waiver of any provision of Section 8 or of any other provision of this Agreement which, by its terms, expressly requires the approval or concurrence of Administrative Agent shall be effective without the written concurrence of Administrative Agent.  Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given.  No notice to or demand on Debtor in any case shall entitle Debtor to any other or further notice or demand in similar or other circumstances. Any amendment, modification, termination, waiver or consent effected in accordance with this Section 9.6 shall be binding upon each Lender at the time outstanding, each future Lender and, if signed by Debtor, on Debtor.

**9.7** **Independence of Covenants**.  All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another covenant shall not avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.

**9.8** **Notices**.  Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given shall be in writing and may be personally served or sent by telefacsimile or United States mail or courier service and shall be deemed to have been given when delivered in person or by courier service or upon receipt if sent by telefacsimile or by the United States mail with postage prepaid and properly addressed.  For the purposes hereof, the address of each party hereto shall be as set forth under such party's name on the signature pages hereof or (a) as to Debtor and Administrative Agent such other address as shall be designated by such Person in a written notice delivered to the other parties hereto and (b) as to each other party, such other address as shall be designated by such party in a written notice delivered to Administrative Agent and Debtor.

**9.9** **Survival of Representations, Warranties and Agreements**.

Lehigh Coal - BET Associates DIP Credit Agreement - DP Draft 7-17-09 (2) (2)

(a)    **Representations and Warranties**.  All representations, warranties and agreements made herein shall survive the execution and delivery of this Agreement and the making of the Loans hereunder.

(b)    **Continuing Obligations**.  Notwithstanding anything in this Agreement or implied by Law to the contrary, the agreements of Debtor set forth in Sections 2.7, 9.2. 9.3 and 9.4 and the agreements of Lenders set forth in Sections 8.2, and 9.5 shall survive the payment of the Loans, the cancellation or expiration of any letter of credit supported by the DIP Facility proceeds and the reimbursement of any amounts drawn thereunder, and the termination of this Agreement.

9.10    **Failure or Indulgence Not Waiver; Remedies Cumulative**.  No failure or delay on the part of Administrative Agent or any Lender in the exercise of any power, right or privilege hereunder or under any other Loan Document shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege.  All rights and remedies existing under this Agreement and the other Loan Documents are cumulative to, and not exclusive of, any rights or remedies otherwise available.

9.11    **Marshalling; Payments Set Aside**.  Neither Administrative Agent nor any Lender shall be under any obligation to marshal any assets in favor of Debtor or any other party or against or in payment of any or all of the Obligations.  To the extent that Debtor or Guarantor makes a payment or payments to Administrative Agent or Lenders (or to Administrative Agent for the benefit of Lenders), or Administrative Agent or Lenders enforce any security interests or exercise their rights of setoff and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy Law, any other state or federal Law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

9.12    **Severability**.  In case any provision in or obligation under this Agreement or any Note shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

9.13    **Obligations Several; Independent Nature of Lenders' Rights**.  The obligations of Lenders hereunder are several and no Lender shall be responsible for the obligations or Commitments of any other Lender hereunder.  Nothing contained herein or in any other Loan Document, and no action taken by Lenders pursuant hereto or thereto, shall be deemed to constitute Lenders as a partnership, an association, a joint venture or any other kind of entity.  The amounts payable at any time hereunder to each Lender shall be a separate and independent debt, and each Lender shall be entitled to protect and enforce its rights arising out of this

Lehigh Coal - BET Associates DIP Credit Agreement - DP Draft 7-17-09 (2) (2)

Agreement and it shall not be necessary for any other Lender to be joined as an additional party in any proceeding for such purpose.

      **9.14**   **Headings**.   Section and subsection headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect.

      **9.15**   **Applicable Law**.   THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE COMMONWEALTH OF PENNSYLVANIA, WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

      **9.16**   **Successors and Assigns**.   This Agreement shall be binding upon the parties hereto and their respective successors and assigns and shall inure to the benefit of the parties hereto and the successors and assigns of Lenders (it being understood that Lenders' rights of assignment are subject to Section 9.1). Debtor's rights or obligations hereunder and any interest therein may not be assigned or delegated by Debtor without the prior written consent of all Lenders.

      **9.17**   **Consent to Jurisdiction and Service of Process**.   ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST DEBTOR ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR ANY OBLIGATIONS THEREUNDER, MAYBE BROUGHT IN THE BANKRUPTCY COURT, AND IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE CITY OF WILKES-BARRE, PENNSYLVANIA OR OF THE UNITED STATES OF AMERICA FOR THE MIDDLE DISTRICT OF PENNSYLVANIA. BY EXECUTING AND DELIVERING THIS AGREEMENT, DEBTOR, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY (A) ACCEPTS GENERALLY AND UNCONDITIONALLY THE NONEXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS; (B) WAIVES ANY DEFENSE OF *FORUM NON CONVENIENS;* (C) AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAYBE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO DEBTOR AT ITS ADDRESS PROVIDED IN ACCORDANCE WITH SECTION 9.8; (D) AGREES THAT SERVICE AS PROVIDED IN CLAUSE (C) ABOVE IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER DEBTOR IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT; (E) AGREES THAT LENDERS RETAIN THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST DEBTOR IN THE COURTS OF ANY OTHER JURISDICTION; AND (F) AGREES THAT THE PROVISIONS OF THIS SECTION 9.17 RELATING TO JURISDICTION AND VENUE SHALL BE BINDING AND ENFORCEABLE TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAWS.

**9.18    Waiver of Jury Trial**.  EACH OF THE PARTIES TO THIS AGREEMENT HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS LOAN TRANSACTION OR THE LENDER/DEBTOR RELATIONSHIP THAT IS BEING ESTABLISHED.  The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this transaction, including contract claims, tort claims, breach of duty claims and all other common law and statutory claims.  Each party hereto acknowledges that this waiver is a material inducement to enter into a business relationship, that each has already relied on this waiver in entering into this Agreement, and that each will continue to rely on this waiver in their related future dealings. Each party hereto further warrants and represents that it has reviewed this waiver with its legal counsel and that it knowingly and voluntarily waives its jury trial rights following consultation with legal counsel.  THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS <u>SECTION 9.18</u> AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE LOANS MADE HEREUNDER.  In the event of litigation, this Agreement may be filed as a written consent to a trial by the court.

**9.19    Confidentiality**.  Each Lender and Administrative Agent shall hold all non-public information obtained pursuant to the requirements of this Agreement confidential in accordance with such Lender's or Administrative Agent's customary procedures for handling confidential information of this nature and in accordance with prudent lending or investing practices, it being understood and agreed by Debtor that in any event a Lender or Administrative Agent shall be permitted to disclose such information (a) to Affiliates of such Lender or Administrative Agent or disclosures reasonably required by any actual or potential assignee, transferee or participant in connection with the contemplated assignment or transfer by a Lender of its Loans or any participations therein; provided that such actual or potential assignee, transferee or participant agrees in writing to be bound by the provisions of this <u>Section 9.19,</u> (b) to such of its respective officers, directors, employees, agents, affiliates and representatives as need to know such information, (c) to the extent requested by any regulatory authority, (d) to the extent otherwise required by applicable Laws or by any subpoena or similar legal process or disclosures, (e) in connection with any suit, action or proceeding relating to the enforcement of its rights hereunder or under the other Loan Documents or (f) to the extent such information becomes (i) publicly available other than as a result of a breach of this <u>Section 9.19</u> or (ii) available to Administrative Agent or any Lender on a nonconfidential basis from a source other than Debtor or Guarantor.

**9.20    Maximum Amount**.

    (a)    **Maximum Amount**.  Regardless of any provision contained in any Loan Document, neither Administrative Agent nor any Lender shall ever be entitled to contract for,

Lehigh Coal - BET Associates DIP Credit Agreement - DP Draft 7-17-09 (2) (2)

charge, take, reserve, receive, or apply, as interest on all or any part of the Obligations, any amount in excess of the maximum rate permitted by applicable Law (the "**Maximum Amount**"), and, if Lenders ever do so, then such excess shall be deemed a partial prepayment of principal and treated hereunder as such and any remaining excess shall be refunded to Debtor. In determining if the interest paid or payable exceeds the maximum rate permitted by applicable Law, Debtor and Lenders shall, to the maximum extent permitted under applicable Law, (i) treat all Loans as but a single extension of credit (and Lenders and Debtor agree that such is the case), (ii) characterize any non-principal payment as an expense, fee, or premium rather than as interest, (iii) exclude voluntary prepayments and the effects thereof, and (iv) amortize, prorate, allocate, and spread the total amount of interest throughout the entire contemplated term of the Obligations. However, if the Obligations are paid and performed in full prior to the end of the full contemplated term thereof, and if the interest received for the actual period of existence thereof exceeds the maximum rate permitted by applicable Law, Lenders shall refund such excess, and, in such event, Lenders shall not, to the extent permitted by Law, be subject to any penalties provided by any Laws for contracting for, charging, taking, reserving, or receiving interest in excess of the maximum rate permitted by applicable Law.

(b) **Application of Excess**. If under any circumstances Lenders shall receive an amount which would exceed the Maximum Amount, such amount shall be deemed a payment in reduction of the principal amount of the applicable Loans and shall be treated as a voluntary prepayment under Section 2.4(a), or if such amount exceeds the unpaid balance of the applicable Loans and any other Indebtedness of Debtor in favor of Lenders, the excess shall be deemed to have been a payment made by mistake and shall be refunded to Debtor.

**9.21** **Counterparts; Effectiveness**. This Agreement and any amendments, waivers, consents or supplements hereto or in connection herewith may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument; signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are physically attached to the same document. This Agreement shall become effective upon the execution of a counterpart hereof by each of the parties hereto and receipt by Debtor and Administrative Agent of written or telephonic notification of such execution and authorization of delivery thereof.

**9.22** **Confession of Judgment.** THE FOLLOWING PARAGRAPH SETS FORTH A WARRANT OF AUTHORITY FOR AN ATTORNEY TO CONFESS JUDGMENT AGAINST DEBTOR. IN GRANTING THIS WARRANT OF ATTORNEY TO CONFESS JUDGMENT AGAINST DEBTOR, DEBTOR HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY AND, ON THE ADVICE OF THE SEPARATE COUNSEL OF DEBTOR, UNCONDITIONALLY WAIVES ANY AND ALL RIGHTS DEBTOR HAS OR MAY HAVE TO PRIOR NOTICE AND AN OPPORTUNITY FOR HEARING UNDER THE RESPECTIVE CONSTITUTIONS AND LAWS OF THE UNITED STATES OF AMERICA AND THE COMMONWEALTH OF PENNSYLVANIA.

DEBTOR IRREVOCABLY AUTHORIZES AND EMPOWERS ANY ATTORNEY OR THE PROTHONOTARY OR CLERK OF ANY COURT IN THE COMMONWEALTH OF PENNSYLVANIA, OR ELSEWHERE, TO APPEAR FOR DEBTOR AT ANY TIME AFTER DEFAULT UNDER THIS AGREEMENT, THE NOTES OR ANY OF THE OTHER LOAN DOCUMENTS IN ANY ACTION BROUGHT AGAINST DEBTOR ON THIS AGREEMENT AT THE SUIT OF AGENT OR ANY LENDER, AS OF ANY TERM, AND IN THAT ACTION TO CONFESS OR ENTER JUDGMENT AGAINST DEBTOR FOR THE ENTIRE UNPAID PRINCIPAL OF THE NOTES AND ALL OTHER SUMS PAID BY LENDERS TO OR ON BEHALF OF DEBTOR PURSUANT TO THE TERMS OF THE LOAN DOCUMENTS, AND ALL INTEREST ACCRUED ON THOSE AMOUNTS, TOGETHER WITH COSTS OF SUIT AND, FOR LIEN PRIORITY PURPOSES ONLY, ATTORNEY'S COMMISSION FOR COLLECTION OF FIVE (5%) PERCENT OF THE TOTAL AMOUNT DUE BY DEBTOR TO LENDERS (BUT IN ANY EVENT NOT LESS THAN FIFTY THOUSAND DOLLARS ($50,000)), TOGETHER WITH INTEREST ON ANY JUDGMENT OBTAINED BY AGENT OR ANY LENDER AT THE DEFAULT RATE, INCLUDING INTEREST AT THE DEFAULT RATE FROM AND AFTER THE DATE OF ANY SHERIFF'S OR JUDICIAL SALE UNTIL ACTUAL PAYMENT IS MADE TO ADMINISTRATIVE AGENT ON BEHALF OF LENDERS OF THE FULL AMOUNT DUE LENDERS; AND FOR SO DOING THIS AGREEMENT OR A COPY OF IT VERIFIED BY AFFIDAVIT SHALL BE A SUFFICIENT WARRANT. THE AUTHORITY GRANTED IN THIS AGREEMENT TO CONFESS JUDGMENT SHALL NOT BE EXHAUSTED BY ANY EXERCISE OF IT BUT SHALL CONTINUE FROM TIME TO TIME AND AT ALL TIMES UNTIL PAYMENT IN FULL OF ALL THE AMOUNTS DUE UNDER THIS AGREEMENT, THE NOTES AND THE OTHER LOAN DOCUMENTS.

IF DEBTOR WISHES TO CHALLENGE ANY JUDGMENT CONFESSED PURSUANT TO THE CONFESSION OF JUDGMENTS PROVISIONS CONTAINED HEREIN, IT SHALL DO SO ONLY BY FILING A PETITION TO STRIKE OR OPEN THE JUDGMENT PURSUANT TO PENNSYLVANIA RULES OF CIVIL PROCEDURE RULE 2959, AS IN EFFECT FROM TIME TO TIME, ("**RULE 2959**") AND SHALL NOT OTHERWISE INTERFERE (BY FILING ANY CIVIL ACTION BILL IN EQUITY, OR OTHERWISE) WITH THE OPERATION OF THIS JUDGMENT GRANTED PURSUANT TO THESES CONFESSION OF JUDGMENTS PROVISIONS. DEBTOR EXPRESSLY ACKNOWLEDGES THAT THE PROCEDURE AVAILABLE TO IT THROUGH RULE 2959 WILL PROVIDE IT WITH A FULL AND FAIR OPPORTUNITY TO BE HEARD AS TO ANY REASON WHY JUDGMENT SHOULD NOT BE ENTERED AGAINST IT.

DEBTOR ACKNOWLEDGES THAT IT UNDERSTANDS THE MEANING AND EFFECT OF THE CONFESSION CONTAINED IN THE FOREGOING PARAGRAPHS. SPECIFICALLY, DEBTOR UNDERSTANDS AMONG OTHER THINGS THAT (1) IT IS RELINQUISHING THE RIGHT TO HAVE THE BURDEN OF PROOF OF DEFAULT REST ON AGENT AND/OR LENDERS PRIOR TO THE ENTRY OF JUDGMENT, (2) THE ENTRY OF JUDGMENT MAY RESULT IN A LIEN ON ITS PROPERTY, (3) IT WILL BEAR THE BURDEN AND EXPENSE OF ATTACKING THE JUDGMENT AND CHALLENGING EXECUTION ON THE LIEN AND SALE OF THE PROPERTY COVERED

Lehigh Coal - BET Associates DIP Credit Agreement - DP Draft 7-17-09 (2) (2)

THEREBY, AND (4) ENOUGH OF ITS PROPERTY MAY BE TAKEN TO PAY THE PRINCIPAL AMOUNT, INTEREST COSTS AND ATTORNEY'S FEES.

## SECTION 10.
## [RESERVED]

## SECTION 11.
## GRANT OF SECURITY, PRIORITIES AND LIENS; SURVIVAL OF CLAIMS

**11.1**    **Grant of Security**.

(a)    **Grant of Security Interest**.  Debtor hereby assigns and transfers to Administrative Agent, and hereby grants to Administrative Agent, for the ratable benefit of Lenders, a security interest in all of the following property now owned or at any time hereafter acquired by Debtor or in which Debtor now has or at any time in the future may acquire any right, title or interest (collectively, the "**Collateral**"), as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the Obligations (including the Bridge Note Claims):

(i)    all Accounts (including, without limitation, any tax refunds or similar amounts owing to Debtor);

(ii)    all Chattel Paper;

(iii)    all Deposit Accounts;

(iv)    all Documents;

(v)    all Equipment;

(vi)    all Farm Products;

(vii)    all Fixtures;

(viii)    all General Intangibles;

(ix)    all Instruments;

(x)    all Intellectual Property;

(xi)    all Inventory;

(xii)    all Investment Property;

(xiii)    all Letter-of-Credit Rights;

(xiv)    all Real Property;

Lehigh Coal - BET Associates DIP Credit Agreement - DP Draft 7-17-09 (2) (2)

(xv)     all Goods and other property not otherwise described above;

(xvi)    all books and records pertaining to the Collateral; and

(xvii)   to the extent not otherwise included, all Proceeds, all supporting obligations, and products of any and all of the foregoing and all collateral security and guarantees given by any Person with respect to any of the foregoing.

(b)      **Representations and Warranties Relating to Collateral**.  To induce Administrative Agent and Lenders to enter into this Agreement and to induce Lenders to make their respective extensions of credit to Debtor hereunder, Debtor hereby represents and warrants to Administrative Agent and each Lender that:

(i)      On the date hereof, Debtor's jurisdiction of organization and the location of Debtor's chief executive office or sole place of business are specified on Schedule 11.1(b);

(ii)     On the date hereof, the Inventory and the Equipment (other than Goods in transit) are kept at the locations listed on Schedule 11.1(b);

(iii)    Debtor is the record and beneficial owner of, and has good and marketable title to, the Investment Property pledged by it hereunder, free of any and all Liens or options in favor of, or claims of, any other Person, except the security interest created by this Agreement and the Pre-Petition Loan Documents;

(iv)     (A) No amount payable to Debtor under or in connection with any Receivable is evidenced by any Instrument or Chattel Paper which has not been delivered to Administrative Agent for the benefit of Lenders, except for an amount less than $25,000 with respect to all such Receivables for Debtor, (B) none of the obligors on any Receivables is a governmental authority with respect to which Debtor is required to and has not complied with the Assignment of Claims Act, except for an amount with respect to all such Receivables for Debtor which are not in excess of 1% of all Debtor's Receivables, and (C) the amounts represented by Debtor to Lenders from time to time as owing to Debtor in respect of the Receivables will at such times be accurate; and

(v)      (A) Schedule 11.1(b) lists all registered Intellectual Property and all other material Intellectual Property owned by Debtor in its own name on the date hereof, (B) on the date hereof, all material Intellectual Property of Debtor described on Schedule 11.1(b) is valid, subsisting, unexpired and enforceable, has not been abandoned and does not infringe on the intellectual property rights of any other Person, (C) except as set forth in Schedule 11.1(b), on the date hereof, none of the Intellectual Property is the subject of any licensing or franchise agreement pursuant to which Debtor is the licensor or franchisor, (D) no holding, decision or judgment has been rendered by any governmental authority which would limit, cancel or question the validity of, or Debtor's rights in, any Intellectual Property in any respect that would reasonably be expected to have a Material Adverse Effect, and (E) no action or proceeding is pending, or, to the knowledge of Debtor, threatened, on the date hereof seeking to limit, cancel or question the validity of any material Intellectual Property or Debtor's ownership interest

Lehigh Coal - BET Associates DIP Credit Agreement - DP Draft 7-17-09 (2) (2)

therein, or which, if adversely determined, would have a Material Adverse Effect on the value of such Intellectual Property.

**11.2    Covenants Relating to Collateral**.    Debtor covenants and agrees with Administrative Agent and Lenders that, from and after the date of this Agreement until the Obligations shall have been paid in full, no letter of credit supported by the use of the DIP Facility proceeds shall be outstanding and the Commitments shall have terminated:

(a)    **Delivery of Instruments and Chattel Paper**.    If any amount payable under or in connection with any of the Collateral shall be or become evidenced by any Instrument, Certificated Security or Chattel Paper, such Instrument, Certificated Security or Chattel Paper shall be immediately delivered to Administrative Agent for the benefit of Lenders, duly indorsed in a manner satisfactory to Administrative Agent, to be held as Collateral pursuant to this Agreement.

(b)    **Payment of Obligations**.    Debtor will pay and discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all taxes, assessments and governmental charges or levies imposed upon the Collateral or in respect of income or profits therefrom, as well as all claims of any kind (including, without limitation, claims for labor, materials and supplies) against or with respect to the Collateral, except that no such charge need be paid if the amount or validity thereof is currently being contested in good faith by appropriate proceedings, reserves in conformity with GAAP with respect thereto have been provided on the books of Debtor and such proceedings could not reasonably be expected to result in the sale, forfeiture or loss of any material portion of the Collateral or any interest therein.

(c)    **Maintenance of Perfected Security Interest; Further Documentation**. Debtor shall maintain the security interest created by this Agreement as a perfected security interest having at least the priority described in the applicable Order and shall defend such security interest against the claims and demands of all Persons whomsoever.

(i)    Debtor will furnish to Administrative Agent and Lenders from time to time statements and schedules further identifying and describing the assets and property of Debtor and such other reports in connection with the Collateral as Administrative Agent may reasonably request, all in reasonable detail.

(ii)    At any time and from time to time, upon the written request of Administrative Agent, and at the sole expense of Debtor, Debtor will promptly and duly execute and deliver, and have recorded, such further instruments and documents and take such further actions as Administrative Agent may reasonably request for the purpose of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein granted, including, without limitation, the filing of any financing or continuation statements under the UCC (or other similar Laws) in effect in any jurisdiction with respect to the security interests created hereby and in the case of Investment Property, Deposit Accounts and any other relevant Collateral, taking any actions necessary to enable Administrative Agent to obtain "control" (within the meaning of the applicable Uniform Commercial Code) with respect thereto.

(d)     **Changes in Locations, Name, etc**.  Debtor will not, except upon fifteen (15) calendar days' prior written notice to Administrative Agent and delivery to Administrative Agent of (i) all additional financing statements and other executed documents reasonably requested by Administrative Agent to maintain the validity, perfection and priority of the security interests provided for herein and (ii) if applicable, a written supplement to Schedule 11.1(b) showing any additional location at which Inventory or Equipment shall be kept:

(i)     permit any of the Inventory or Equipment to be kept at a location other than those listed on Schedule 11.1(b);

(ii)     change its jurisdiction of organization or the location of its chief executive office or sole place of business from that referred to in Section 11.1(b)(i); or

(iii)     change its name, identity or corporate structure to such an extent that any financing statement filed by Administrative Agent in connection with this Agreement would become misleading.

(e)     **Notices**.  Debtor will advise Administrative Agent and Lenders promptly, in reasonable detail, of:

(i)     any Lien (other than security interests created hereby or Liens permitted under this Agreement) on any of the Collateral which would adversely affect the ability of Administrative Agent to exercise any of its remedies hereunder; and

(ii)     the occurrence of any other event which would reasonably be expected to have a Material Adverse Effect on the aggregate value of the Collateral or on the security interests created hereby.

(f)     **Investment Property**.

(i)     If Debtor shall become entitled to receive or shall receive any stock certificate (including, without limitation, any certificate representing a stock dividend or a distribution in connection with any reclassification, increase or reduction of capital or any certificate issued in connection with any reorganization), option or rights in respect of the capital stock of any issuer, Debtor shall accept the same as the agent of Administrative Agent and Lenders, hold the same in trust for Administrative Agent and Lenders and deliver the same forthwith to Administrative Agent in the exact form received, duly indorsed by Debtor to Administrative Agent, if required, together with an undated stock power covering such certificate duly executed in blank by Debtor and with, if Administrative Agent so requests, signature guaranteed, to be held by Administrative Agent, subject to the terms hereof, as additional collateral security for the Obligations.  Any sums paid upon or in respect of the Investment Property upon the liquidation or dissolution of any issuer (except any liquidation or dissolution of any Subsidiary in accordance with this Agreement) shall be paid over to Administrative Agent to be held by it hereunder as additional collateral security for the Obligations, and in case any distribution of capital shall be made on or in respect of the Investment Property or any property shall be distributed upon or with respect to the Investment Property pursuant to the recapitalization or reclassification of the capital of any issuer or pursuant to the reorganization

thereof, the property so distributed shall, unless otherwise subject to a perfected security interest in favor of Administrative Agent for the benefit of Lenders, be delivered to Administrative Agent to be held by it hereunder as additional collateral security for the Obligations. If any sums of money or property so paid or distributed in respect of the Pledged Securities shall be received by Debtor, Debtor shall, until such money or property is paid or delivered to Administrative Agent, hold such money or property in trust for Lenders, segregated from other funds of Debtor, as additional collateral security for the Obligations.

(ii)     Without the prior written consent of Administrative Agent, at the directions of Required Lenders, Debtor will not (A) vote to enable, or take any other action to permit, any issuer to issue any stock or other equity securities of any nature or to issue any other securities convertible into or granting the right to purchase or exchange for any stock or other equity securities of any nature of any issuer, (B) sell, assign, transfer, exchange, or otherwise dispose of, or grant any option with respect to, the Investment Property or Proceeds thereof (except pursuant to a transaction expressly permitted by this Agreement), (C) create, incur or permit to exist any Lien or option in favor of, or any claim of any Person with respect to, any of the Investment Property or Proceeds thereof, or any interest therein, except for the security interests created by this Agreement or (D) enter into any agreement or undertaking restricting the right or ability of Debtor or Administrative Agent to sell, assign or transfer any of the Pledged Stock or Proceeds thereof.

(iii)    In the case of Debtor which is an issuer, such issuer agrees that (A) it will be bound by the terms of this Agreement relating to the Pledged Stock issued by it and will comply with such terms insofar as such terms are applicable to it, (B) it will notify Administrative Agent promptly in writing of the occurrence of any of the events described in Section 11.1(e) with respect to the Pledged Stock issued by it and (C) the terms of Sections 11.3(b)(iii) and 11.3(f) shall apply to it, mutatis mutandis, with respect to all actions that may be required of it pursuant to Section 11.3(b)(iii) or 11.3(f) with respect to the Pledged Stock issued by it.

(g)    **Receivables**.  Except in the ordinary course of business consistent with past practice, Debtor will not (i) grant any extension of the time of payment of any Receivable, (ii) compromise or settle any Receivable for less than the full amount thereof, (iii) release, wholly or partially, any Person liable for the payment of any Receivable, (iv) allow any credit or discount whatsoever on any Receivable or (v) amend, supplement or modify any Receivable in any manner that could adversely affect the value thereof.

(h)    **Rolling Stock**.  All Rolling Stock owned by Debtor on the Closing Date that is subject to a Certificate of Title is set forth on Schedule 11.2(h), together with the state (or states, if applicable) in which such Rolling Stock is registered. There is no state in which Debtor has based any material Rolling Stock (except for Rolling Stock in transit) other than those states listed on Schedule 11.2(h). If requested by the Required Lenders, all original Certificates of Title for the Rolling Stock owned by Debtor shall be promptly delivered to the Administrative Agent. To the extent required by the Orders and requested by the Administrative Agent, Debtor will take all steps necessary to ensure that each Certificate of Title issued with respect to any Equipment of Debtor has the Lien of Administrative Agent, for the benefit of Lenders, noted

Lehigh Coal - BET Associates DIP Credit Agreement - DP Draft 7-17-09 (2) (2)

thereon (and Debtor shall pay or reimburse Administrative Agent for all fees, costs and other disbursements in connection with documenting, preparing and taking such actions). Debtor hereby irrevocably constitutes and appoints Administrative Agent its true and lawful agent and attorney-in-fact, and in such capacity the Administrative Agent shall have, without any further action required by or on behalf of Debtor, the right, with full power of substitution, in the name of Debtor or otherwise, for the use and benefit of Administrative Agent and the Lenders: (i) to sign the name of Debtor on any application for a Certificate of Title for the purpose of noting the Administrative Agent's Lien thereon; (ii) to undertake any and all other steps on Debtor's behalf that are needed to perfect the Lien of Administrative Agent, for the benefit of Lenders, in Rolling Stock subject to a Certificate of Title, and (iii) to do all other acts and things necessary or appropriate to carry out the intent and purposes of this <u>Section 11.2(h)</u>.

       **11.3**    <u>**Remedial and Other Provisions**</u>.

       (a)    **Certain Matters Relating to Receivables**.

       (i)    Administrative Agent shall have the right to make test verifications of the Receivables in any manner and through any medium that it reasonably considers advisable, and Debtor shall furnish all such assistance and information as Administrative Agent may require in connection with such test verifications; provided, that prior to a Default or Event of Default such test verifications shall be done without any notice that the verification is being done by a secured party being given to any of the obligors on such Receivables and if any such test verifications constitute a report of a collateral auditor, such verifications shall be performed in compliance with <u>Section 5</u> of this Agreement. At any time and from time to time, upon Administrative Agent's request and at the expense of the relevant Debtor, Debtor shall cause independent public accountants or others satisfactory to Administrative Agent to furnish to Administrative Agent reports showing reconciliations, aging and test verifications of, and trial balances for, the Receivables; <u>provided</u>, that prior to a Default or Event of Default such reports shall be prepared without any notice that the reports are being prepared by a secured party being given to any of the obligors on such Receivables and if any such reports constitute a report of a collateral auditor, such reports shall be prepared in compliance with <u>Section 5</u> of this Agreement.

       (ii)    Administrative Agent hereby authorizes Debtor to collect Debtor's Receivables, subject to Administrative Agent's direction and control, and Administrative Agent may curtail or terminate said authority at any time after the occurrence and during the continuance of an Event of Default. At Administrative Agent's request at any time after the occurrence and during the continuance of an Event of Default, any payments of Receivables, when collected by any Debtor, (A) shall be forthwith (and, in any event, within one Business Day) deposited by Debtor in the exact form received, duly indorsed by Debtor to a Deposit Account controlled by Administrative Agent, subject to withdrawal by Administrative Agent for the account of Lenders as provided in <u>Section 11.3(c)</u> and (B) until so turned over, shall be held by Debtor in trust for Administrative Agent and Lenders, segregated from other funds of Debtor. Each such deposit of Proceeds of Receivables shall be accompanied by a report identifying in reasonable detail the nature and source of the payments included in the deposit.

Lehigh Coal - BET Associates DIP Credit Agreement - DP Draft 7-17-09 (2) (2)

(iii)     At Administrative Agent's request at any time and from time to time after the occurrence and during the continuance of a Default or Event of Default or at any other time at which Administrative Agent has reasonable grounds to believe that a Default or Event of Default will occur, Debtor shall deliver to Administrative Agent all original and other documents evidencing, and relating to, the agreements and transactions which gave rise to the Receivables, including, without limitation, all original orders, invoices and shipping receipts.

(iv)     The rights of Administrative Agent with respect to the Receivables set forth in this section shall be in addition to whatever rights Administrative Agent and Lenders shall have with regard to the Receivables set forth elsewhere in this Agreement, subject to Section 9.1(d).

(b)     **Communications with Obligors; Debtors Remain Liable**.

(i)     Administrative Agent in its own name or in the name of others may at any time communicate with obligors under the Receivables to verify with them to Administrative Agent's satisfaction the existence, amount and terms of any Receivables; provided, that prior to the occurrence of an Event of Default, Administrative Agent shall not indicate to any obligors that the verification is being done by a secured party.

(ii)     Upon the request of Administrative Agent at any time after the occurrence and during the continuance of an Event of Default, Debtor shall notify obligors on the Receivables that the Receivables have been assigned to Administrative Agent for the ratable benefit of Lenders and that payments in respect thereof shall be made directly to Administrative Agent.

(iii)     Anything herein to the contrary notwithstanding, Debtor shall remain liable under each of the Receivables to observe and perform all the conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement giving rise thereto.  Neither Administrative Agent nor any Lender shall have any obligation or liability under any Receivable (or any agreement giving rise thereto) by reason of or arising out of this Agreement or the receipt by Administrative Agent or any Lender of any payment relating thereto, nor shall Administrative Agent or any Lender be obligated in any manner to perform any of the obligations of any Debtor under or pursuant to any Receivable (or any agreement giving rise thereto) to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party thereunder, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

(c)     **Proceeds to Be Turned Over to Administrative Agent**.  In addition to the rights of Administrative Agent and Lenders specified in Section 11.3(a) with respect to payments of Receivables, all Proceeds received by any Debtor consisting of cash, checks and other near-cash items shall be held by Debtor in trust for Administrative Agent, for the benefit of Lenders, and at the request of the Administrative Agent shall be segregated from other funds of Debtor, and, forthwith upon receipt by Debtor, be turned over to Administrative Agent (or a

Deposit Account controlled by Administrative Agent) in the exact form received by Debtor (duly indorsed by Debtor to Administrative Agent, if required). All Proceeds received by Administrative Agent hereunder shall be held by Administrative Agent and applied to the Obligations in accordance with the terms hereof. All Proceeds while held by Administrative Agent (until applied to the Obligations) shall continue to be held as collateral security for all the Obligations and shall not constitute payment thereof until applied as provided in Section 11.3(d).

(d) **Application of Proceeds**. At such intervals as may be agreed upon by Debtor and Administrative Agent, or, if an Event of Default shall have occurred and be continuing, at any time at Administrative Agent's election, Administrative Agent may apply all or any part of Proceeds constituting Collateral, in payment of the Obligations in the following order:

First, to pay incurred and unpaid fees and expenses of Administrative Agent under the Loan Documents;

Second, to Administrative Agent, for application by it towards payment of amounts then due and owing and remaining unpaid in respect of the Obligations, pro rata among Lenders according to the amounts of such Obligations then due and owing and remaining unpaid to Lenders;

Third, to Administrative Agent, for application by it towards prepayment of the Obligations, pro rata among Lenders according to the amounts of such Obligations then held by Lenders; and

Fourth, any balance of such Proceeds remaining after the Obligations shall have been paid in full, and the Commitments shall have terminated shall be paid over to Debtor or to whomsoever may be lawfully entitled to receive the same.

(e) **Code and Other Remedies**. If an Event of Default shall occur and be continuing, Administrative Agent, on behalf of Lenders, may exercise, in addition to all other rights and remedies granted to them in this Agreement and in any other instrument or agreement securing, evidencing or relating to the Obligations, all rights and remedies of a secured party under the UCC or any other applicable Law. Without limiting the generality of the foregoing, Administrative Agent, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by Law referred to below) to or upon any Debtor or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived), may in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and/or may forthwith sell, lease, assign, give option or options to purchase, or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of Administrative Agent or any Lender or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk. Administrative Agent or any Lender shall have the right upon any such public sale or sales, and, to the extent permitted by Law, upon any such private sale or sales, to purchase the whole or

Lehigh Coal - BET Associates DIP Credit Agreement - DP Draft 7-17-09 (2) (2)

any part of the Collateral so sold, free of any right or equity of redemption in any Debtor, which right or equity is hereby waived and released.  Debtor further agrees, at Administrative Agent's request, to assemble the Collateral and make it available to Administrative Agent at places which Administrative Agent shall reasonably select, whether at Debtor's premises or elsewhere. Administrative Agent shall apply the net proceeds of any action taken by it pursuant to this Section 11.3(e), after deducting all reasonable costs and expenses of every kind incurred in connection therewith or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of Administrative Agent and Lenders hereunder, including, without limitation, reasonable attorneys' fees and disbursements, to the payment in whole or in part of the Obligations, in such order as Administrative Agent may elect, and only after such application and after the payment by Administrative Agent of any other amount required by any provision of Law, including, without limitation, Section 9-615(a)(3) of the UCC, need Administrative Agent account for the surplus, if any, to any Debtor.  To the extent permitted by applicable Law, Debtor waives all claims, damages and demands it may acquire against Administrative Agent or any Lender arising out of the exercise by them of any rights hereunder, except for any such claims which are specifically permitted herein.  If any notice of a proposed sale or other disposition of Collateral shall be required by Law, such notice shall be deemed reasonable and proper if given at least twenty (20) days before such sale or other disposition.

       (f)    **Waiver; Deficiency**.  Debtor shall remain liable for any deficiency if the proceeds of any sale or other disposition of the Collateral are insufficient to pay its Obligations and the fees and disbursements of any attorneys employed by Administrative Agent or any Lender to collect such deficiency.

    **11.4**   **Priority and Liens**.  Debtor hereby covenants, represents and warrants that the Obligations of Debtor hereunder and under the other Loan Documents shall at all times be secured by a perfected first priority senior, priming lien on and security interest in and to all existing and future Collateral, senior in priority to the liens of the Pre-Petition Lenders and any other Person pursuant to Section 364(d) of the Bankruptcy Code.  Pursuant to Section 364(c)(1) of the Bankruptcy Code, the Obligations shall be entitled to "super priority" claim status in the Case.

    **11.5**   **No Discharge; Survival of Claims**.  Debtor agrees that to the extent its Obligations hereunder are not satisfied in full, (a) its Obligations arising hereunder shall not be discharged by the entry of a confirmation order (and Debtor, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (b) the super-priority claim granted to Administrative Agent and Lenders pursuant to the Orders and described in Section 11.3 and the Liens granted to Administrative Agent and Lenders pursuant to the Orders and described in Section 11.3 shall not be affected in any manner by the entry of a confirmation order.

[Signature Page Follows]

Lehigh Coal - BET Associates DIP Credit Agreement - DP Draft 7-17-09 (2) (2)

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers hereunto duly authorized as of the date first written above.

**DEBTOR:**

LEHIGH COAL AND NAVIGATION COMPANY

By: _____

    Name:

    Title:

<u>Notice Address for Debtor:</u>

Lawrence G. McMichael, Esquire
Dilworth Paxson LLP
1500 Market Street, Suite 3500E
Philadelphia, PA 19102
Facsimile: (215) 575-7200

**ADMINISTRATIVE AGENT:**

BET ASSOCIATES IV, LLC

By: _____
     Name:
     Title:

<u>Notice Address</u>:

Klehr, Harrison, Harvey, Branzburg & Ellers LLP
260 South Broad Street
Philadelphia, PA 19102
Attention:  Jeffrey Kurtzman, Esq.
Facsimile:  (215) 568-6603

**LENDERS**:

[TO FOLLOW]

By: _____
      Name:
      Title:

<u>Notice Address</u>:

Klehr, Harrison, Harvey, Branzburg & Ellers LLP
260 South Broad Street
Philadelphia, PA 19102
Attention:  Jeffrey Kurtzman, Esq.
Facsimile:  (215) 568-6603